TWIN CITY BAKERY WORKERS AND WELFARE FUND, individually and on behalf of all others similarly situated, Plaintiffs,

v.

ASTRA AKTIEBOLAG, Aktiebolaget Hässle, Astrazeneca L.P., KBI–E, Inc., KBI, Inc., and Merck & Co., Inc., Defendants.

Rose Baldwin United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, Plaintiffs,

v.

Astra Aktiebolag, Aktiebolaget Hässle, Astrazeneca L.P., KBI–E, Inc., KBI, Inc., and Merck & Co., Inc., Defendants.

Nos. 01 CIV. 9730(JSR), 01 CIV. 9105(JSR).

United States District Court, S.D. New York.

June 21, 2002.

Lee Squitieri (lead counsel—argued motion), Squitieri & Fearon, L.L.P., New York City, Kenneth Wexler, Wexler and Associates, Chicago, IL, Daniel E. Gustafson, Brian L. Williams, Heins Mills & Olson, P.L.C., Minneapolis, MN, Marc Edelson, Hoffman & Edelson, Doylestown, PA, for plaintiffs.

Joel Cohen (lead counsel—argued motion), Diem–Suong Nguyen, Davis Polk & Wardell, New York City, for defendants Astra Aktiebolag, Aktiebolaget Hassle, Astra Zeneca LP.

John DeQ. Briggs, Kenneth Donnelly, Howrey Simon Arnold & White, LLP, Washington, DC, for Defendants KBI–E, Inc., KBI, Inc., Merck & Co.

### MEMORANDUM ORDER

RAKOFF, District Judge.

In these consolidated actions, *see* Order, March 29, 2002, plaintiffs allege that defendants monopolized and attempted to monopolize the market for the gastric acid inhibiting drug Prilosec 7 ("Prilosec") in violation of Section 2 of the Sherman Antitrust Act, and in so doing also violated the laws of 19 states and the District of Columbia. . Plaintiffs claims are largely premised on the allegation that defendants engaged in "sham" litigation in an attempt

to prevent generic competitors from entering the market.

By way of background, the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, specifies that approval by the Food and Drug Administration ("FDA") is required before a company may market a new drug. To obtain such approval, the company must file a New Drug Application ("NDA") with the FDA indicating, *inter alia*, that the drug is safe and effective. *See* 21 U.S.C. § 355. If the new drug is covered by one or more patents, that information must also be provided in the NDA, and, upon approval of the drug, the FDA lists any such patents in what is known as the "Orange Book." *See* 21 U.S.C. § 355(b). If, after approval, the company obtains a new patent covering the same drug, it files a supplement to the NDA, and the new patent is then added to the Orange Book. 21 U.S.C. § 355(c)(2).

When, following approval of a new drug, a different applicant seeks approval of a generic version of the previously-approved drug, it must file an abbreviated new drug application ("ANDA") certifying either that: (I) no patent for the previously-approved drug has been filed; (II) the patents for the previously-approved drug have expired; (III) the patents for the previously-approved drug will expire prior to the first date on which the generic drug will be marketed; or (IV) the patents for the previously-approved drug are invalid or will not be infringed by the generic version. *See* 21 U.S.C. § 355(j)(2)(A)(vii). Those filing the fourth certification—known as a "Paragraph IV" certification—are required to notify the holders of the patents on the previously-approved drug, who then have 45 days to initiate action against the generic applicant. *See* 21 U.S.C. §§ 355(j)(2)(B), 355(j)(5)(B)(iii). If a holder of the previous patent then brings a patent infringement suit against the new

applicant within this 45–day period, approval of the generic drug is automatically stayed for 30 months, unless the sued-upon patent expires and/or there is a final judicial determination of non-infringement from which no appeal can be taken at an earlier date. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 21 CFR § 314.107(e).

The net effect of these provisions is to create a "loophole" by which the manufacturer of the originally-approved drug, by obtaining new but related patents shortly before the original patent on the drug is due to expire and then (when the applicability of the new patents is effectively challenged through a Paragraph IV certification) initiating an infringement action against the generic-drug applicant, can delay approval of the generic drug for at least 30 months and thereby extend its monopoly substantially beyond the terms of the original patent. Needless to say, numerous manufacturers have sought to take advantage of this loophole and, in so doing, have drawn increasing criticism of their monopoly-extending actions that harm, not just generic-drug manufacturers, but also consumers and their representatives, such as plaintiffs here. But when Congress passes statutes as detailed as the food and drug laws, it inevitably creates loopholes that only Congress can close. As for the courts, they are largely limited to voiding obvious shams but are otherwise mostly powerless to cure the problem.

Accordingly, plaintiffs, in these consolidated actions, focus the allegations of their jointly-filed Amended Complaint on what they allege was a fraud and a sham. Specifically, they allege that the defendants, having legitimately obtained FDA approval of Prilosec in 1989 pursuant to a patent that was due to (and did) expire on October 5, 2001 (after receiving a 6–month pediatric exclusivity extension pursuant to

21 U.S.C. § 355), caused to be listed in the Orange Book ten later-obtained patents that they knew did not actually proscribe generic versions of Prilosec but that would enable the defendants, after receiving the generic applicants' Paragraph IV certifications, to initiate sham litigation against the generic manufacturers and thereby artificially preserve defendants' monopoly of the market for Prilosec for at least an additional 30 months. *See* Amended Complaint §§ 65–69.

According to the Amended Complaint, the sham litigation consists of twelve patent infringement suits brought by the defendants against ten generic-drug applicants, alleging infringement of six of the ten later-filed patents. *See* Amended Complaint ¶¶ 84–128. The Amended Complaint broadly alleges that these suits, which have been consolidated before the Honorable Barbara Jones, *see In re Omeprazole Patent Litigation,* No. MDL 1291(BJ), are baseless and brought for purposes of monopolization. The Amended Complaint further notes that Judge Jones has previously declared invalid all asserted claims of two of the six patents here in issue, as well as parts of a third patent. Amended Complaint ¶¶ 104–105.

Against these allegations, defendants move to dismiss the Amended Complaint on the basis, *inter alia,* of the so-called "*Noerr–Pennington* doctrine." As articulated in *Eastern RR. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the *Noerr–Pennington* doctrine holds that, by virtue of the right to petition guaranteed by the First Amendment, attempts to influence legislative, executive, administrative or judicial action are immune from federal antitrust liability. *See Noerr,* 365 U.S. at 136, 81

S.Ct. 523 (1961); *Pennington,* 381 U.S. at 670, 85 S.Ct. 1585 (1965). *See California Motor Trans. Co. v. Trucking Unlimited,* 404 U.S. 508, 509–510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

*Noerr–Pennington* immunity is not, however, absolute. Among other things, it does not protect the bringing of "sham" litigation, *see California Motor Trans.,* 404 U.S. at 516, 92 S.Ct. 609, nor the procurement of patents by fraud, *see Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). *See also In re Independent Serv. Organizations Antitrust Litig.,* 203 F.3d 1322, 1326 (Fed.Cir. 2000); *Nobelpharma A.B. v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed. Cir.1998).

In *Professional Real Estate Investors Inc v. Columbia Pictures Indus. Inc.* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Supreme Court established a two-part test of what constitutes "sham" litigation under *Noerr–Pennington.* "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;" and second, "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. . . ." *Id.* at 60, 113 S.Ct. 1920. Where possible, moreover, this analysis should be addressed to the face of the complaint, in order to avoid chilling a litigant's exercise of the right to petition. *See generally Thomson Information Services, Inc. v. Lyons Commercial Data, Inc.,* 1998 WL 193236, *1 (S.D.N.Y.1998) (claims of "sham" will not survive motion to dismiss absent a threshold showing of objective baselessness); *see also Caplan v. American Baby, Inc.,* 582 F.Supp. 869, 871 (S.D.N.Y.1984).

In this case, the determinations already reached in the companion patent infringe-

ment litigation render it legally impossible for plaintiffs to meet the first criterion. As both sides agree, this Court, even on a motion to dismiss, may take cognizance not only of those orders of Judge Jones expressly referenced in the Amended Complaint but also of her other orders and related public records in the case before her. *See, e.g., In re Buspirone Patent Litigation,* 185 F.Supp.3d 363, 367 (S.D.N.Y.2002); *see generally Chambers v. Time Warner,* 282 F.3d 147, 152 (2d Cir. 2002). Thus, on the one hand, while the Amended Complaint makes reference only to Judge Jones' orders declaring invalid two of the six patents here, as well as part of third, the Court can take cognizance of the fact that, after denying summary judgment as to two more of the patents, Judge Jones subsequently held a third patent invalid and the parties, subject to an appeal of the underlying claim construction, contingently stipulated to the invalidity of a fourth patent. *See* Order, MDL. No. 1291, July 2, 2001; Order, M–21–91, MDL No. 1291, April 22, 2002; Stipulation and Order, April 15, 2002. But on the other hand, the Court can also take notice of the fact that the validity of the remaining two patents went completely unchallenged throughout the pretrial proceedings before Judge Jones, and that she subsequently tried on the merits the claims that these two patents were infringed by the generic-drug applicants. *See* Order M 21–91, MDL No. 1291, November 5, 2001.[1] These

determinations, allowing claims of infringement of four of the six asserted patents to proceed beyond summary judgment, and two of the four to proceed through trial, preclude any contention that defendants' litigation is so baseless as not to warrant *Noerr–Pennington* immunity. *See, e.g., Bio–Technology Gen. Corp. v. Genentech, Inc.,* 886 F.Supp. 377, 382 (S.D.N.Y.1995); *Prof'l Educ. Group Inc. v. Harcourt Brace Legal & Prof'l Publ'ns, Inc.* 1995 U.S. Dist. LEXIS 9802 at *29–30 n. 12 (D.Minn. Apr. 17, 1995); *USS–POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL–CIO,* 31 F.3d 800, 811 (9th Cir.1994).[2]

Although plaintiffs further seek to avoid the force of the *Noerr–Pennington* doctrine by alleging, in a conclusory fashion, that the defendants obtained the ten later-listed patents by defrauding the Patent Office, and, further, defrauded the FDA by misstating the scope of these patents, *see* Amended Complaint ¶¶ 67–74, 149, nothing in the complaint details the "who, what, when, where, and how" of the alleged frauds, as required by Fed.R.Civ.P. 9(b). *See Durabla Mfg. Co. v. Goodyear Tire & Rubber Co.,* 992 F.Supp. 657, 661 (S.D.N.Y. 1998). This, moreover, is not only a matter of failure to plead with particularity, for even in their motion papers plaintiffs have not suggested that they have any particulars to repair this deficiency. As a result, their argument that administrative fraud precludes application of the *Noerr–Pennington* doctrine is unavailing.[3]

---

1. The bench trial of those claims having been completed, the matter is presently *sub judice* before Judge Jones.

2. Nor is this, as plaintiffs contend, a case of "serial" sham litigation, where the merit of some of the claims can not immunize a party bringing a coercive series of litigations. *See Primetime 24 Joint Venture v. National Broadcasting,* 219 F.3d 92 (2d Cir.2000). Whereas *Primetime* involved "simultaneous and voluminous" lawsuits brought against a single

television provider, *id.* at 101, the lawsuits complained of in the Amended Complaint are simply individual actions against each of ten generic-drug applicants. It would be unreasonable to expect defendants to initiate litigation against only some of the generic-drug applicants they claim are infringing their patents.

3. Plaintiffs also seem to be alleging some sort of fraud or misconduct resulting from defendants' argument to the FDA regarding the

Plaintiffs seek still further to avoid the force of *Noerr–Pennington* immunity by noting that it does not apply to the act itself of submitting the ten later-filed patents for listing in the Orange Book, which plaintiffs allege was done for an anti-competitive purpose. *See In re Buspirone*, 185 F.Supp.2d at 372–373. But whereas in *In re Buspirone*, the listings there, which were made just one day before the expiration of the initial patent, triggered a forty-five day delay in the FDA approval of the generic drug, the listing of the ten patents here in issue all occurred well before the expiration of the initial '431 patent, and hence, in contrast to *In re Buspirone*, did not themselves lead to any extension of defendants' monopoly. Rather, the extension here is the result of the defendants' having commenced the now-consolidated lawsuits before Judge Jones before the expiration of the original patent, in response to plaintiffs' Paragraph IV notices regarding six of the added patents. Thus, the argument regarding the listings adds nothing to the fraud and sham litigation arguments already rejected above.

Finally, plaintiffs' other attempts to allege anti-competitive conduct outside the scope of the *Noerr–Pennington* doctrine are irrelevant on their face. Thus, while the Amended Complaints allege that one of the defendants improperly entered into an agreement with a pharmaceutical and product development company, aai Pharma Inc., with the goal of developing, prosecuting, and listing in the Orange Book other related patents, the Amended Complaint also notes that these patents were never actually listed in the Orange Book. Amended Complaint ¶¶ 131, 133. Likewise, while the Amended Complaints allege that defendants agreed to market the drug Nexium, a competitor of Prilosec, Amended Complaint ¶¶ 134, 135, they never allege how this is anti-competitive.

The Court has considered plaintiffs' other arguments in support of their federal claims and finds them similarly lacking in merit. As for plaintiffs' state-law claims, the Court sees no adequate reason to retain supplemental jurisdiction over them once the federal claims are dismissed. *See, e.g., United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir.1995)..

Accordingly, defendants' motion to dismiss is granted, the federal law claims are dismissed with prejudice, and the pendant state law claims are dismissed without prejudice. Clerk to enter judgment.

. SO ORDERED.

---

proper interpretation of the statute and regulations relating to Paragraph IV filing. Amended Complaint ¶¶ 70–72. However, a legal argument promoting a particular interpretation of a statute can not be the basis of a fraud claim.