**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 12-1429**

─────────────

WAUGH CHAPEL SOUTH, LLC; WCS LLC; WCS PROPERTIES BUSINESS
TRUST; ELG INGLEWOOD LLC,

            Plaintiffs – Appellants,

        v.

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 27; UNITED
FOOD & COMMERCIAL WORKERS UNION, LOCAL 400; MID–ATLANTIC
RETAIL FOOD INDUSTRY JOINT LABOR MANAGEMENT FUND,

            Defendants – Appellees.

─────────────

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   William D. Quarles, Jr., District
Judge.  (1:11-cv-00841-WDQ)

─────────────

Argued:  May 16, 2013              Decided:  August 26, 2013

─────────────

Before KING, DIAZ, and FLOYD, Circuit Judges.

─────────────

Affirmed in part, vacated in part, and remanded by published
opinion.  Judge Diaz wrote the opinion, in which Judge King and
Judge Floyd joined.

─────────────

**ARGUED:**   Ira  Lee  Oring,  FEDDER  &  GARTEN,  PA,  Baltimore,
Maryland, for Appellants.  Michael Timothy Anderson, MURPHY
ANDERSON PLLC, Washington, D.C., for Appellee United Food and
Commercial Workers Union Local 27; Sharon McNeilly Goodman,
SLEVIN & HART, P.C., Washington, D.C., for Appellee Mid-Atlantic
Retail Food Industry Joint Labor Management Fund.  **ON BRIEF:**
Neil Dubovsky, FEDDER & GARTEN, PA, Baltimore, Maryland, for

Appellants.   Arlus J. Stephens, Lorrie E. Bradley, MURPHY ANDERSON PLLC, Washington, D.C., Joel A. Smith, David Gray Wright, KAHN, SMITH & COLLINS, P.A., Baltimore, Maryland, for Appellee UFCW Local 27; Carey R. Butsavage, John A. Durkalski, BUTSAVAGE & ASSOCIATES, P.C., Washington, D.C., for Appellee UFCW Local 400; Barry S. Slevin, Laura O. Aradi, SLEVIN & HART, P.C., Washington, D.C., for Appellee MRFI JLM Fund.

DIAZ, Circuit Judge:

Waugh Chapel South, LLC, WCS LLC, WCS Properties Business Trust (collectively "WCS") sued the United Food and Commercial Workers Union Locals 27 and 400 ("UFCW") and the Mid-Atlantic Retail Food Industry Joint Labor Management Fund (the "Fund") under the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 187, which provides a cause of action for victims of "unfair labor practices" as defined by the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 158(b)(4). In its complaint,[1] WCS alleges that the defendants orchestrated fourteen separate legal challenges against their commercial real estate project in order to force WCS to terminate their relationship with a non-unionized supermarket--conduct that WCS alleged was an illicit "secondary boycott" under § 158(b)(4)(ii)(B).

The defendants moved to dismiss the complaint under the Noerr-Pennington[2] doctrine, claiming that their First Amendment right to petition the courts insulated their litigation activity from liability. Alternatively, the Fund moved to dismiss the

---

[1] Plaintiff ELG Inglewood LLC ("ELG") also sued the unions (Count II), alleging similar actions with respect to a related commercial real estate development. As discussed below, those claims were dismissed in part, and ELG has since waived decision on its appeal.

[2] See United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965); E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961).

complaint on the basis that it was not a "labor organization" under the NLRA.  The district court agreed with both arguments and granted the motions to dismiss.  This appeal followed.

We agree with the district court that the Fund is not a "labor organization" under the NLRA, but conclude that the Noerr-Pennington doctrine does not (at least at this stage) spare the remaining defendants from the allegations of the complaint.  Although the courts are a medium by which citizens may exercise their First Amendment right to petition their government, the act of petitioning those courts may not serve as the means to achieve illegal ends.  Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515 (1972).  Under this "sham litigation" exception to the Noerr-Pennington doctrine, we hold that the pleadings and the concomitant record evidence in this case, if credited by a factfinder, are sufficient to show that the unions have abused their right to petition the courts beyond the point of constitutional protection.  We therefore affirm in part, vacate in part, and remand to the district court for a determination of whether the unions waged a secondary boycott in the manner alleged in the complaint.

I.

WCS and ELG are commercial real estate developers of two respective shopping centers in Anne Arundel County, Maryland:

4

(1) the Village at Waugh Chapel South ("Waugh Chapel"); and (2) the Woodmore Towne Centre ("Woodmore").[3]  Both companies planned to lease a storefront unit in each of their shopping centers to Wegmans Food Markets, Inc.  Because the Wegmans supermarket chain does not employ organized labor, both projects were opposed by the defendant unions.

That opposition commenced in December 2006 when union leadership "set[] its sights on Wegmans" to mount an antagonistic campaign.  J.A. 14.  According to WCS, a union executive threatened WCS that if Wegmans did not unionize, "we will fight every project you develop where Wegmans is a tenant."  J.A. 18.  The unions thereafter directed and funded a barrage of legal challenges at every stage of the projects' development.

The first of these challenges occurred in August 2008, when UFCW Secretary-Treasurer George Murphy, represented by his attorney G. Macy Nelson, petitioned the Anne Arundel City Council (the "Council") to revoke its decision to rezone the Waugh Chapel site from agricultural and residential to mixed-use commercial.  WCS argued that Murphy lacked standing.  The day

_____

[3] We recite the facts here as a prelude to deciding whether Noerr-Pennington warrants dismissal of the claims.  For reasons described below, we treat the district court's dismissal as a grant of summary judgment to the unions, and therefore consider all facts and reasonable inferences therefrom in the light most favorable to WCS, the non-moving party.  Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011).

before a scheduled hearing on the merits, Murphy withdrew the petition and effectively ceded that he was not an "aggrieved party." J.A. 441.

After this petition failed, the union employed surrogate plaintiffs to pursue their legal challenges. For the next few years, Nelson would represent plaintiffs in sixteen other proceedings objecting to the development of the shopping centers, with the unions allegedly directing the litigation. Three of those challenges pertained to Woodmore and are not before us on appeal. We summarize the thirteen other challenges to Waugh Chapel below.

- In December 2009, Paul Gilliam, Tracee Gilliam, and the environmental organization "Patuxent Riverkeeper" appealed the Council's decision to extend the time for WCS to post fees and bonds for the project. WCS later posted the bonds and fees, mooting the case.

- In March 2010, Robert Smith and Madonna Brennan sued in Maryland state court to enjoin the Council's approval of "Tax Increment Financing" ("TIF") bonds, arguing that the Council did not conduct the requisite hearing. The Council did indeed fail to conduct a hearing, a failure it remedied by holding another hearing in May to reauthorize the TIF bonds. The case was then dismissed as moot.

- In June 2010, Smith and Brennan sued several defendants associated with the development project, including the Council and the Maryland Department of Energy ("MDE"), alleging the development had caused a nuisance. After a brief period of discovery in which Smith and Brennan proffered expert testimony, the parties moved for summary judgment. The state court found that there was no nuisance and dismissed the suit.

- In July 2010, Smith and Patuxent Riverkeeper filed a state court petition to vacate the MDE's issuance of a mining

6

permit to WCS. They filed an identical petition in August when the MDE issued an amended mining permit. The state court dismissed the July petition as based only on the "conjecture" and "speculation" of affidavits provided by plaintiffs. J.A. 196-97. After this dismissal, the plaintiffs voluntarily dismissed their August petition.

- From May to July 2011, Smith, Sandra Bowie, and Rosie Shorter appealed the grant of nine separate building and grading permits issued by the Council to WCS. They withdrew the appeals after WCS subpoenaed the unions' financial records.

On March 31, 2011, WCS and ELG sued the unions under the LMRA, 29 U.S.C. § 187, alleging two counts of secondary boycott activity under § 158(b)(4)(ii)(B). Count 1 of the complaint pertained to the Waugh Chapel shopping center (WCS), while Count 2 pertained to the Woodmore Towne Center (ELG). As to Count 1, the district court categorized the fourteen legal challenges directed against Waugh Chapel as follows: (1) one "successful petition" to appeal the issuance of the TIF bonds, J.A. 55, (2) two environmental suits dismissed for lack of standing, and from which the court would not infer baselessness, (3) ten grading and building "petitions withdrawn to avoid subpoenas" from which the court would not infer baselessness, J.A. 57, (4) one petition appealing the extension of time for WCS to post bonds and pay fees that became moot, and (5) one environmental suit dismissed on the merits "after thoughtful consideration," J.A. 58.

The Fund successfully moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that it was not a "labor organization" subject to the LMRA.  And because the district court concluded that none of the prior legal challenges to the development of Waugh Chapel were objectively baseless, it dismissed Count I on Noerr-Pennington grounds.  While the court allowed a portion of Count II to survive the unions' motion to dismiss,[4] a subsequent consent order also dismissed that count.

II.

Before reaching the merits of this appeal, we first address the procedural posture of this appeal and our jurisdiction to decide it.

A.

Although the parties do not address it, we must determine our appellate jurisdiction to entertain this appeal under 12 U.S.C. § 1291, as "we are bound in all cases to ascertain our own appellate jurisdiction before reviewing a district court

---

[4] As to ELG's Count II, the district court concluded that one of the three underlying legal proceedings allegedly instigated by the unions was objectively baseless.  Accordingly, the court granted the unions' motion to dismiss as to two of the three alleged 'sham' suits, but allowed this one portion of Count II to survive.

8

judgment." Reid v. Angelone, 369 F.3d 363, 374 n.7 (4th Cir. 2004).

"With few narrow exceptions," including certain interlocutory and collateral orders, "our jurisdiction extends only to appeals from all final decisions of the district courts of the United States." United States v. Myers, 593 F.3d 338, 344 (4th Cir. 2010). In this case, after the district court dismissed WCS's Count I and most of Count II with prejudice, ELG and the unions entered into a consent order, which purported to dismiss the remainder of Count II of the complaint "with prejudice, but without prejudice to refiling in any other proceeding." J.A. 68. "This kind of split judgment ordinarily would not be considered 'final' and therefore appealable under 28 U.S.C. § 1291 because it does not wind up the entire litigation in the district court." Palka v. City of Chicago, 662 F.3d 428, 433 (7th Cir. 2011); see also GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 175-76 (4th Cir. 2007).

Several of our sister circuits have held that litigants may not use voluntary dismissals as a subterfuge to manufacture jurisdiction for reviewing otherwise non-appealable, interlocutory orders. See Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 791-92 (8th Cir. 2012); Rabbi Jacob Joseph School v. Province of Mendoza, 425 F.3d 207, 210 (2d Cir. 2005); LNC Investments LLC v. Republic of Nicaragua, 396 F.3d 342, 346 (3d

Cir. 2005); Marshall v. Kansas City S. Ry. Co., 378 F.3d 495, 499-500 (5th Cir. 2004); James v. Price Stern Sloan, Inc., 283 F.3d 1064, 1070 (9th Cir. 2002); CSX Transp., Inc. v. City of Garden City, 235 F.3d 1325, 1327 (11th Cir. 2000); ITOFCA, Inc. v. MegaTrans Logistics, Inc., 235 F.3d 360, 365 (7th Cir. 2000); Cook v. Rocky Mountain Bank Note Co., 974 F.2d 147, 148 (10th Cir. 1992). "Tolerance of that practice would violate the long-recognized policy against piecemeal appeals," Rabbi Jacob Joseph School, 425 F.3d at 210, and would allow "an end-run around the final judgment rule." Palmieri v. Defaria, 88 F.3d 136, 140 (2d Cir. 1996).

ELG confesses that its Rule 41(a)(2) voluntary dismissal was intended to allow appellate review of an otherwise interlocutory order. See Appellants' Br. at 3 n.1 ("The claims relating to one of those actions was dismissed by the March 29, 2012 Consent Order to allow for a final judgment.").

> Under these circumstances, the question of remedy looms. In most cases, the proper remedy will be to reverse the Rule 41(a)(2) order and remand for completion of the case, without considering the merits of the earlier interlocutory order(s). We may also deem the ambiguous voluntary dismissal of Count [II] to be with prejudice and go on to consider the appeal from the district court's dismissal of all remaining claims.

Madsen v. Audrain Health Care, Inc., 297 F.3d 694, 698 (8th Cir. 2002) (internal quotations omitted). As did the Eighth Circuit, we choose the latter remedy here, as it polices the boundaries

10

of our appellate jurisdiction without punishing the litigants in this appeal. Accordingly, we deem ELG's voluntary dismissal of Count II to be with prejudice and proceed to consider WSC's appeal of its remaining claims.

B.

We next address a procedural wrinkle regarding the district court's Rule 12(b)(6) dismissal. While we have since questioned our decision to do so, see IGEN Int'l, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 311 (4th Cir. 2003), we have held that the Noerr-Pennington doctrine is an affirmative defense,[5] N.C. Elec. Membership Corp. v. Carolina Power & Light, 666 F.2d 50, 52 (4th Cir. 1981). The district court, however, purported to adjudicate the merits of the unions' Noerr-Pennington defense under Rule 12(b)(6), which is a procedure that tests only the sufficiency of a complaint and "cannot reach the merits of an

---

[5] In IGEN Int'l, the defendant Roche Diagnostics GmbH failed to raise the Noerr-Pennington doctrine until after the district court denied its motion to dismiss. 335 F.3d at 308-10. On appeal, Roche challenged the district court's decision to deny its Noerr-Pennington argument as untimely. While conceding that "[t]his circuit has previously characterized Noerr-Pennington as an affirmative defense," the panel nonetheless stated in dicta that "Roche was not required to plead [Noerr-Pennington] as an affirmative defense." Id. at 311.

We, however, remain bound by our earlier precedent that the Noerr-Pennington doctrine is an affirmative defense. See McMellon v. United States, 387 F.3d 329, 333 (4th Cir. 2004).

affirmative defense . . . . [unless] all facts necessary to the affirmative defense clearly appear on the face of the complaint." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (internal quotations omitted).

While WCS's complaint alleges that the unions directed a series of adverse lawsuits in order to wage a secondary boycott, the mere reference to the purportedly sham proceedings does not show--on the face of the complaint--whether Noerr-Pennington bars WCS's claims as a matter of law. In fact, much of the relevant evidence that the district court considered on the point consisted of materials[6] the parties appended as part of the "Rule 12(b)(6) motion to dismiss, which is not a pleading." Mellon Bank, N.A. v. Ternisky, 999 F.2d 791, 795 (4th Cir. 1993).

We also note that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

---

[6] These documents principally concerned the underlying administrative and state court proceedings and consisted of permit applications, legal filings, administrative hearings, judicial orders, deposition excerpts, and affidavits. The unions attached these materials to their motion to dismiss, as did WCS to their response to that motion.

12

Fed. R. Civ. P. 12(d). Here, the district court did not formally convert the unions' motion to dismiss to one for summary judgment, believing instead that it could adjudicate the unions' motion under Rule 12(b)(6) by considering documents incorporated into the complaint by reference, and taking judicial notice of the purported sham proceedings.

It is not obvious to us that incorporation by reference is appropriate in this context given our holding in Goodman that a district court may consider only "the face of the complaint." Goodman, 494 F.3d at 464. Nor should "judicial notice" be used as an expedient for courts to consider "matters beyond the pleadings" and thereby upset the procedural rights of litigants to present evidence on disputed matters. Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, ___ F.3d ___, 2013 WL 3336884, slip op. at 10 (4th Cir. July 3, 2013) (en banc) (internal quotations omitted); see Haavistola v. Cmty. Fire Co. of Rising Sun, Inc. 6 F.3d 211, 218 (4th Cir. 1993).

But the bottom line is that the district court did allow the parties to supplement the record before ruling on the motion to dismiss. Moreover, the parties did not request discovery or otherwise object to the court's procedural management of the unions' motion to dismiss. As we have stated before,

13

we are not bound by the label that the district court places upon its disposition of the case. Whenever outside matters are presented to and not excluded by the trial court, the motion to dismiss should be considered on appeal as one for summary judgment even though the trial court characterized its action as a dismissal of the case for failure of plaintiffs to state a claim upon which relief can be granted. The record in this case shows that both parties were given a reasonable opportunity to present evidence upon which the trial court could properly determine whether summary judgment should be entered. Therefore, it is proper for this court on appeal to consider this as a motion for summary judgment.

Dean v. Pilgrim's Pride Corp., 395 F.3d 471, 474 (4th Cir. 2005) (internal quotations omitted). We conclude that the principle announced in Dean applies directly here, and so we too will consider the unions' motion to dismiss based on the Noerr-Pennington doctrine as one for summary judgment.

As to the dismissal of the Fund under Rule 12(b)(6), therefore, we will "review the district court's grant of a motion to dismiss de novo," McCauley v. Home Loan Inv. Bank, F.S.B., 710 F.3d 551, 554 (4th Cir. 2013), accepting the allegations of WCS's complaint as true, Trail v. Local 2850 UAW United Def. Workers of Am., 710 F.3d 541, 543 (4th Cir. 2013). But because we have refashioned the district court's dismissal of the claim against the remaining defendants as a grant of summary judgment, we review de novo whether there are any genuine issues of material fact for the trier of fact to resolve and, if not, whether the unions were entitled to dismissal as a

14

matter of law. <u>Reynolds v. Am. Nat'l Red Cross</u>, 701 F.3d 143, 149 (4th Cir. 2012).

## III.

We first consider the district court's decision to dismiss the claim against the Fund on the basis that it is not a "labor organization" under the NLRA subject to the secondary boycott prohibitions of the LMRA. The NLRA defines a "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

We have "given a broad interpretation to the 'dealing with' requirement." <u>NLRB v. Peninsula Gen. Hosp. Med. Ctr.</u>, 36 F.3d 1262, 1270 (4th Cir. 1994). But we have also explained that the "dealing with" phraseology denotes a "bilateral mechanism" through which an employee entity and management reciprocally interact:

> As we understand this "bilateral mechanism" analysis, several general principles are readily apparent. . . : (1) while the term "dealing with" connotes activity which is broader than collective bargaining, an employer does not necessarily "deal with" its employees merely by communicating with them, even if the matters addressed concern working

15

conditions; (2) "dealing" occurs only if there is a "pattern or practice" over time of employee proposals concerning working conditions, coupled with management consideration thereof; [and] (3) isolated instances of the conduct described in number two do not constitute "dealing[.]"

Id. at 1271–72.

An employee entity may be a "labor organization" if its purpose or activity involves "dealing with" employers. Id. at 1270 n.6. Yet the Fund satisfies neither of these criteria. First, WCS's own complaint alleges that the Fund is prohibited under its charter from "participating directly or indirectly . . . in union collective activities." J.A. 13. Second, while the "question of whether an organization is a 'labor organization' is primarily one of fact," Peninsula Gen., 36 F.3d at 1269, the only fact suggesting any interactions between the Fund and an employer concerns the alleged secondary boycott. There is plainly no "bilateral mechanism" when the only alleged contact between an employee entity and management is an unfair labor practice directed against an employer.

Although the Fund has designated itself as a "labor organization" for purposes of tax liability, this is not sufficient to render it a "labor organization" for the purposes of labor law. The Internal Revenue Code ("I.R.C.") has a distinct definition of "labor organization." See 26 U.S.C. § 501(c)(5); 26 C.F.R. § 1.501(c)(5)-1(a). The First Circuit

16

has refused to borrow the NLRA definition of "labor organization" to determine the meaning of that term under the I.R.C. Tupper v. United States, 134 F.3d 444, 446 n.1 (1st Cir. 1998). We agree with our sister circuit that the "I.R.C. and the NLRA have very different objectives," and we similarly decline "to import definitions from statutes with unrelated or cross-purposes." Id.

Because Plaintiffs fail to allege that the Fund has engaged in a pattern or practice of "dealing with" employers, it is not a "labor organization" under the NLRA and is not subject to the conditions of the LMRA. We therefore affirm the district court's decision to dismiss the complaint against the Fund.

IV.

A.

We next consider whether the district court correctly dismissed the claim against the remaining defendants. Plaintiffs allege that the unions' various legal challenges to the Waugh Chapel development violated the secondary boycott provision of the NLRA, which extends to efforts to "exert pressure on an unrelated, secondary or neutral employer in order to coerce the secondary employer to cease dealing with the primary employer, thereby advancing the union's goals indirectly." R.L. Coolsaet Constr. Co. v. Local 150, Int'l

17

Union of Operating Eng'rs, AFL-CIO, 177 F.3d 648, 655 (7th Cir. 1999) (internal quotations omitted).

The unions counter that their litigation activity is protected by the Noerr-Pennington doctrine, which safeguards the First Amendment right to "petition the government for a redress of grievances," U.S. Const. amend. I, by immunizing citizens from the liability that may attend the exercise of that right. See Noerr, 365 U.S. at 136-39; Pennington, 381 U.S. at 669.

The principle originated from Noerr, where the Supreme Court extended First Amendment protection to lobbying efforts for anti-competitive legislation, explaining that "mere attempts to influence the passage or enforcement of laws" cannot comprise a violation of antitrust law. Noerr, 365 U.S. at 135.

The Court has since expanded Noerr-Pennington immunity to alleged labor law violations, BE & K Constr. Co. v. NLRB, 536 U.S. 516, 526 (2002), and to "the approach of citizens or groups of them to administrative agencies . . . and to courts, the third branch of Government." Cal. Motor, 404 U.S. at 510. However, the First Amendment offers no protection when "petitioning activity ostensibly directed toward influencing governmental action, is a mere sham to cover . . . an attempt" to violate federal law. Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. ("PREI"), 508 U.S. 49, 56 (1993) (internal quotations omitted).

18

The Supreme Court's first engagement with this exception occurred in California Motor, where highway carriers instituted a slew of "state and federal proceedings to resist and defeat applications by respondents to acquire operating rights or to transfer or register those rights." 404 U.S. at 509. Respondents, a group of rival highway carriers, filed an antitrust suit claiming this litigation activity constituted anti-competitive conduct. The Court concluded that the facts alleged came within the "sham" exception to the Noerr-Pennington doctrine, explaining that sham litigation occurs where "a pattern of baseless, repetitive claims . . . emerge[s] which leads the factfinder to conclude that the administrative and judicial processes have been abused." Id. at 513.

The Supreme Court revisited the sham litigation standard in PREI, which involved a defendant's counterclaim that the copyright action it was defending was a sham suit designed to violate antitrust law. In examining the applicability of Noerr-Pennington, the Court set forth a "two-part definition of 'sham litigation.' First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." PREI, 508 U.S. at 60. The second inquiry focuses on the "litigant's subjective motivation . . . [and] whether the baseless lawsuit conceals an attempt to" violate federal law "through the use of the

19

governmental process." Id. at 60-61. Because "the sham exception contains an indispensable objective component," id. at 58, "even an improperly motivated lawsuit may not be enjoined . . . as an unfair labor practice unless such litigation is baseless," id. at 59.

It is unclear whether PREI distinguished or displaced the sham litigation test first propounded in California Motor. Two of our sister circuits, however, "reconcile" the two cases "by reading them as applying to different situations. Professional Real Estate Investors provides a strict two-step analysis to assess whether a single action constitutes sham petitioning. . . . California Motor Transport deals with the case where the defendant is accused of bringing a whole series of legal proceedings." USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL–CIO ("POSCO"), 31 F.3d 800, 810-11 (9th Cir. 1994); accord Primetime 24 Joint Vent. v. Nat'l Broad. Co., 219 F.3d 92, 101 (2d Cir. 2000).

We have not had occasion to confront this issue, as our precedent has applied PREI only where a party has alleged a single sham proceeding. See IGEN Int'l, 335 F.3d at 307-08; Baltimore Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 397-98 (4th Cir. 2001). Nevertheless, we agree with the distinction adopted by our sister circuits. In the absence of any express statement that the sham litigation standard in PREI supplanted

20

California Motor, we are obligated to "follow the case which directly controls, leaving to th[e] [Supreme Court] the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989).[7]

We distinguish PREI because it is ill-fitted to test whether a series of legal proceedings is sham litigation. When a party contends that it is defending a sham lawsuit, it is relatively simple for a judge to decide whether the singular claim it is presiding over is objectively baseless. See PREI, 508 U.S. at 59-61. But it is an entirely different undertaking to collaterally review--as here--fourteen state and administrative lawsuits for baselessness. It is especially difficult to do so where the presiding tribunal in those cases had no occasion to measure the baselessness of the suit because

___

[7] While the parties fully briefed and argued this issue in the court below, WCS has not pressed for a different sham litigation standard on appeal. Nevertheless, "we possess the discretion under appropriate circumstances to disregard the parties' inattention to a particular argument or issue." United States v. Ashford, ___ F.3d ___, 2013 WL 3069778, slip op. at 2 (4th Cir. June 20, 2013) (internal quotations omitted). In order to properly assess whether WCS's complaint should be dismissed because of the Noerr-Pennington doctrine, we believe it is necessary to apply the correct sham litigation standard, and we exercise our discretion to do so.

At oral argument, the unions sensed our inclination to sua sponte address this question, and requested that we allow supplemental briefing on this point. We deny this request, as we have reviewed the parties' briefing at the district court on this issue and find it more than sufficient.

(1) it had no inkling that the action comprised a possible campaign of sham litigation, and (2) the plaintiffs preempted an assessment of frivolity by prematurely withdrawing some of their suits.

Accordingly, when purported sham litigation encompasses a series of legal proceedings rather than a singular legal action, we conclude the sham litigation standard of California Motor should govern. In this context, the focus is not on any single case. Rather a district court should conduct a holistic evaluation of whether "the administrative and judicial processes have been abused." Cal. Motor, 404 U.S. at 513. The pattern of the legal proceedings, not their individual merits, centers this analysis:

> One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, viz., effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

Id. Of course, the subjective motive of the litigant and the objective merits of the suits are relevant, but other signs of bad-faith litigation--including those present in this case--may also be probative of an abuse of the adjudicatory process.

22

B.

We now review the unions' motion to dismiss under this test.[8] Accordingly, we ask whether the record evidence presents a genuine issue of material fact as to whether the unions indiscriminately filed (or directed) a series of legal proceedings without regard for the merits and for the purpose of violating federal law. We conclude that it does.

In our view, the vast majority of the legal challenges failed demonstrably. In fact, it appears that only the March 2010 suit to enjoin the approval of TIF bonds could be called successful.

The plaintiffs objectively lacked standing in the proceedings to rescind the rezoning decision by the Council, as Maryland law requires a party to attend the public hearing of an administrative body in order to have standing as an aggrieved party. See, e.g., Cnty. Council v. Billings, 21 A.3d 1065, 1075 (Md. 2011).

Two additional suits regarding the MDE issuance of surface mining permits were dismissed as "based in critical part only on

---

[8] "Although we could remand to the district court for reconsideration under the appropriate standard of review, doing so would serve no useful purpose. . . . The validity vel non of a summary judgment entails a pure question of law and, therefore, we are fully equipped to resolve the question as a matter of first-instance appellate review." Piccicuto v. Dwyer, 39 F.3d 37, 40 (1st Cir. 1994).

23

conjecture," J.A. 196, as the petitioners supplied only their own conclusory affidavits of environmental harm with no scientific data or expert testimony.  Finally, collateral estoppel would have barred the nine appeals of the building and grading permits, as the petitioners simply repeated the substance of their nuisance claim--dismissed weeks earlier--that the developments caused environmental harm to their property.

While there is no particular win-loss percentage that a litigant must achieve to secure the protection of the First Amendment, a one-out-of-fourteen batting average at least suggests "a policy of starting legal proceedings without regard to the merits and for the purpose of [violating the law]." POSCO, 31 F.3d at 811; cf. Kaiser Found. Health Plan, Inc. v. Abbott Lab. Inc., 552 F.3d 1033, 1046-47 (9th Cir. 2009) (no sham litigation where plaintiffs "won seven of the seventeen suits" and eight of the ten defeats concerned novel or close questions of law); POSCO, 31 F.3d at 811 (no sham litigation where fifteen out of twenty-nine suits succeeded); Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag, 207 F. Supp. 2d 221, 224 (S.D.N.Y. 2002) (no sham litigation where the court allowed "four of the six asserted patents to proceed beyond summary judgment.").

Of course, some of the legal challenges directed by the unions may have been justifiable in one sense or another.  For

example, the petition appealing the issuance of TIF bonds could be characterized as successful.  Nevertheless, the fact that there may be moments of merit within a series of lawsuits is not inconsistent with a campaign of sham litigation, for "even a broken clock is right twice a day."  POSCO, 31 F.3d at 811.

We note some other indicia of bad-faith litigation.  First, there was a perverse nature to the environmental litigation directed by the unions to enjoin the commercial development. Because WCS and MDE entered into a consent decree to remediate preexisting environmental contamination, an injunction would have terminated the consent decree and prevented any environmental remediation from actually occurring.

Second, plaintiffs withdrew ten of the fourteen suits under suspicious circumstances.  UFCW Secretary-Treasurer Murphy's eleventh-hour withdrawal of the August 2008 petition occurred a day before a hearing on the merits and after WCS had expended significant resources opposing the petition.  And in the nine appeals of the building and grading permits, plaintiffs voluntarily dismissed their suits--according to WCS--to avoid complying with subpoenas of financial records that would have revealed that the unions were directing and paying for the litigation.  While third-party financing of legal proceedings does not itself demonstrate an illegal purpose or render those suits sham, see Balt. Scrap, 237 F.3d at 400-01, a reasonable

25

factfinder could credit this evidence in deciding whether "the administrative and judicial processes have been abused." Cal. Motor, 404 U.S. at 513.

The unions' post hoc justifications for these suits, as well as their alternative theories for why the sham litigation exception should not apply, fail to persuade us that dismissal of WCS's complaint is appropriate. We first reject the notion that because no attorney or union member faced liability for sanctions or an abuse of process tort under Maryland law, imposing federal liability for sham litigation "[u]ndermines [f]ederalism" and the autonomy of states to regulate access to their courts. Appellee's Br. at 32. Maryland courts have the authority to police litigation abuses, Felder v. Casey, 487 U.S. 131, 138 (1988), but no state may dictate the terms of a litigant's First Amendment right to petition its courts by the operation of this power. See Harman v. Forssenius, 380 U.S. 528, 540 (1965) ("State[s] may not impose a penalty upon those who exercise a right guaranteed by the Constitution.").

Just as we do not trespass on the prerogative of Maryland to police access to its courts, a state court's decision of whether or not to penalize sham litigation cannot control our determination of whether we should afford it constitutional protection. It would make little sense to cede that federal question to state law proceedings that involve issues that are

26

distinct from our inquiry under California Motor. See Keller v. State Bar of Cal., 496 U.S. 1, 11 (1990) ("Of course the Supreme Court of California is the final authority on the 'governmental' status of the State Bar of California for purposes of state law. But its determination . . . is not binding on us when such a determination is essential to the decision of a federal question.").

In any event, while a state court's appraisal of the merits of litigation aids the sham exception inquiry, see Balt. Scrap, 237 F.3d at 399-400, the plaintiffs in the majority of the cases withdrew their suits before an adjudication. Moreover, WCS could not pursue sanctions against the unions, as they were not parties to the litigation. And even in the cases that reached an adjudication, we accord slight significance to the absence of a formal declaration of baselessness by the presiding tribunal where--as here--the defendants and the court did not have reason to suspect an improper motive behind the suits. Cf. PREI, 508 U.S. at 51-55.

The unions also emphasize that sham litigation must "effectively bar[] [WCS] from access to the agencies and courts." Cal. Motor, 404 U.S. at 513. But this "access-barring" language cannot mean that litigation must reach such a crescendo as to literally incapacitate the legal system and

27

prevent another litigant from receiving their day in court.[9]

Instead, legal challenges need only "harass and deter [litigants] in their use of administrative and judicial proceedings so as to deny them 'free and unlimited' access to those tribunals." Id. at 511 (emphasis added). It is enough that WCS alleged that the series of legal challenges threatened their $260 million commercial development with substantially increased risk and costs. If any of those suits had succeeded in staying the project, even momentarily, WCS may have succumbed to the boycott and replaced Wegmans with a unionized tenant.

For this reason, we reject the unions' final argument that their series of legal challenges was not access-barring as a matter of law because it did not block development of the shopping centers. If anything, the ineffectiveness of the lawsuits in this case tends to prove, not dispel, the charge of

---

[9] We disagree with the unions that either Racetrac Petroleum, Inc. v. Prince George's County, 601 F. Supp. 892 (D. Md. 1985), aff'd on its reasoning, 786 F.2d 202 (4th Cir. 1986), or Pendleton Construction Corp. v. Rockbridge County, Virginia, 652 F. Supp. 312 (W.D. Va. 1987), aff'd on its reasoning, 837 F.2d 178 (4th Cir. 1988), stand for such a proposition. These cases neither involved a pattern of litigation nor adopted the suggestion that litigation cannot be sham where a litigant ultimately received a fair adjudication. In fact, we rejected such a literal conception of access-barring in Hosp. Building Co. v. Trs. of Rex Hosp., concluding that access-barring occurs "if the proof establishes . . . intent to delay approval of HBC's application for a certificate of need and thereby delay its entrance into the Raleigh market." 691 F.2d 678, 687 (4th Cir. 1982) (emphasis added).

sham litigation. Because successfully halting the project would defeat any sham litigation argument in the first place, see Balt. Scrap, 237 F.3d at 399 ("By definition, a winning lawsuit is a reasonable effort at petitioning for redress and therefore not a sham." (internal quotations omitted)), this "heads I win, tails you lose" theory of access-barring would nullify the sham litigation exception altogether.

We conclude that there remains a genuine issue of material fact as to whether the pattern of litigation alleged in WCS's complaint derived from "a policy of starting legal proceedings without regard to the merits and for the purpose of" waging a secondary boycott. POSCO, 31 F.3d at 811. In light of the poor litigation record and the signs of bad-faith petitioning, a factfinder could reasonably conclude that the unions have abused their right to petition the courts and, as a result, have forfeited the protection of the First Amendment. Therefore, the district court erred in dismissing WCS's claims against the unions.

V.

For the foregoing reasons, we affirm the district court's dismissal of WCS's complaint as to the Fund, vacate the

29

dismissal of WCS's complaint as to the remaining union defendants, and remand for further proceedings.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>