******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

PROCUREMENT, LLC *v.* GURPREET AHUJA ET AL.
(AC 41680)

DiPentima, C. J., and Keller and Harper, Js.

*Syllabus*

The plaintiff, P Co., a real estate development company, sought damages from the defendant A, a property owner, and the defendant H Co., a real estate holding company, for vexatious litigation in connection with P Co.'s plans to construct a mixed use development project in Stamford. P Co. alleged that the defendants sought to impede its development project through A's opposition to three of P Co.'s zoning applications. The trial court granted the defendants' motion for summary judgment, determining that A's zoning appeals were protected activity pursuant to the *Noerr-Pennington* doctrine, which shields individuals from liability for petitioning a government entity for redress in order to advocate their causes regarding business and economic interests. On appeal, P Co. claimed, inter alia, that the trial court erred in concluding that A's appeals were not objectively baseless and, therefore, that the sham exception to the *Noerr-Pennington* doctrine, which does not protect activity brought with no reasonable expectation of obtaining a favorable ruling, was not applicable. *Held*:

1. The trial court properly determined that there was no genuine issue of material fact and that A's legal actions in contesting various changes to P Co.'s zoning applications did not qualify for the sham exception to the *Noerr-Pennington* doctrine; contrary to the plaintiff's claim, A's appeals were not objectively baseless and did not become baseless merely because they failed; a reasonable litigant in A's position could have concluded that P. Co.'s failure to comply with the Stamford zoning regulations resulted in an incomplete application, and that the zoning board's failure to post notice of a hearing continuation could have been grounds for an appeal, and, once the trial court determined that at least one claim in an action had objective merit, it was not required to determine whether additional claims in the same action were not objectively baseless.

2. P Co. could not prevail on its claim that the trial court misinterpreted the sham exception to the *Noerr-Pennington* doctrine in applying the two part analysis in *Professional Real Estate Investors*, *Inc.* v. *Columbia Pictures Industries*, *Inc.* (508 U.S. 60), in which a trial court may examine a litigant's subjective motivations only if the challenged litigation was objectively meritless; although P Co. claimed that A's petitioning activity consisted of several legal proceedings rather than a single proceeding, and that the trial court should have applied the holistic analysis in *California Motor Transport Co.* v. *Trucking Unlimited* (404 U.S. 508), in which a court may analyze a litigant's subjective motivations in determining whether A's appeals were not baseless, the two part analysis was appropriate in the present case because there were only three actions alleged to have been baseless, and the holistic analysis argued by P Co. has only been applied in cases concerning proceedings that far outnumbered those in the present case.

Argued November 14, 2019—officially released June 2, 2020

*Procedural History*

Action seeking to recover damages for, inter alia, vexatious litigation, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Arnold, J.*, granted the plaintiff's motion to substitute Nicholas Ahuja, executor of the estate of Gurpreet Ahuja, for the named defendant; subsequently, the trial court, *Ecker, J.*, granted in part the defendants' motion for summary judgment and rendered judgment thereon; thereafter, the plaintiff withdrew the remaining

count of the complaint and appealed to this court. *Affirmed.*

*Richard C. Robinson,* with whom was *Jonathan A. Kaplan,* for the appellant (plaintiff).

*Peter Milano,* for the appellees (substitute defendant et al.).

*Opinion*

KELLER, J. The plaintiff, Procurement, LLC, brings this action sounding in vexatious litigation, abuse of process, violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42a-110g et seq., aiding and abetting, and tortious interference with contractual and business relations, and seeking damages from the defendants Gurpreet Ahuja[1] and Ahuja Holdings, LLC (Holdings), on the ground that they generally sought to impede the plaintiff's development of a mixed use development project. The plaintiff appeals from the judgment of the trial court rendered after the granting of the defendants' motion for summary judgment. On appeal, the plaintiff claims that (1) the trial court erred in concluding as a matter of law that Ahuja's zoning appeals with regard to the plaintiff's proposed development plan were not objectively baseless and, therefore, the sham exception to the *Noerr-Pennington* doctrine was not applicable, and (2) the court misinterpreted the sham exception under the *Noerr-Pennington* doctrine.[2] We affirm the judgment of the trial court.

The following procedural history, as set forth by the trial court in its thorough, well reasoned memorandum of decision, is relevant to this appeal. This appeal and the underlying litigation arose "out of a series of interrelated administrative and judicial proceedings . . . involving [the plaintiff's development project]." The plaintiff's development plan involved "the construction of a large childcare center and approximately twenty residential units on High Ridge Road in Stamford." "For ease of reference, the court . . . describe[d] the allegedly wrongful activity at issue . . . [in] three distinct, though related, administrative and judicial proceedings, each involving [the] defendants' opposition to a particular zoning application made by [the] plaintiff in connection with its High Ridge Road project. . . .

"The initial round of administrative and judicial proceedings arose out of a set of applications submitted by [the plaintiff] to the Stamford Zoning Board (board) in April, 2010. These included an application for special exception approval, and an application for approval of site and architectural plans, each of which related to [the plaintiff's] intention to develop a two-story building consisting of a day care center and nine residential units on the subject property ([collectively referred to as the first application]). The board held hearings on the first application in December, 2010, and voted on January 10, 2011, to deny the application for a special exception. [The plaintiff] timely appealed the denial to the Superior Court.

"Ahuja's formal involvement in the first application did not come until over a year later, on February 22, 2012, when she filed a motion to intervene in the appeal pending in the Superior Court. The motion described

her status as a statutorily aggrieved landowner pursuant to General Statutes § 8-8, based on the fact that she owned property within 100 feet of the subject property. Ahuja alleged that her participation as an intervenor had become necessary because there was no longer true adversity between [the] plaintiff . . . and [the board] due to the board's recent action on a second, modified zoning application [for a special permit] made by [the plaintiff], which the board had approved while the appeal of the decision in the first application was pending. . . . Ahuja argued that [the plaintiff] and the board were now essentially on the same side, and would settle the appeal unless the court permitted her to intervene in support of the board's denial of the special exception sought in the first application.

"Ahuja's motion to intervene was denied by the court (*Adams, J.*), on May 30, 2012. . . . The [court, denying intervention,] weighed the various factors relevant to permissive intervention and determined that a majority of those considerations counseled denial of Ahuja's motion to intervene. The existence of Ahuja's then pending appeal from the board's approval of the second application . . . gave [the court] pause, because it was possible that intervention might not lead to more efficient proceedings in light of that appeal . . . but [the court] ultimately chose to exercise [its] discretion to deny intervention. To ensure that Ahuja's interests would be protected, [the court] ordered the parties to provide three weeks' notice to Ahuja in the event of a settlement [of the plaintiff's appeal], which would allow her to participate in any hearing for judicial approval of the settlement under . . . § 8-8 (n). There is no suggestion anywhere in the [court's decision denying intervention], express or implied, that Ahuja's motion to intervene was frivolous, vexatious or otherwise objectively unreasonable.

"Ahuja sought appellate review of [the court's] intervention order by filing a timely petition for certification pursuant to . . . § 8-8 (o) and Practice Book § 81-1. Certification was granted by the Appellate Court on October 24, 2012. A game of litigation chess followed. [The plaintiff] (which had opposed Ahuja's motion to intervene) filed a motion in the Superior Court case to implead Ahuja as a party defendant on May 25, 2013. Ahuja (who had sought to intervene) initially objected to [the plaintiff's] motion to implead. The board also objected. [The court, *Berger, J.*] granted the motion to implead on August 23, 2013. Ahuja withdrew [her] appeal in the Appellate Court on October 4, 2013, and the Superior Court case proceeded on the merits. Ahuja's trial brief, filed on October 15, 2013, adopted the board's trial brief in its entirety and added less than two pages of additional argument. [The court] held a merits hearing on December 6, 2013, and issued a decision on February 14, 2014. . . . [The court] found that the board's decision denying a special exception was

not supported by substantial evidence, and therefore sustained [the plaintiff's] appeal in connection with the first application.

"In late July, 2011, after the board's denial of the first application and while the appeal of that denial was pending in the Superior Court, [the plaintiff] filed a second application for a special permit with the board. The second application sought to develop a day care center and twenty-two residential units at the subject property, an increase from the nine units proposed in the first application. A series of five public hearings on the second application were held by the board in the latter part of 2011. . . . The board voted to approve the second application on December 12, 2011.

"Ahuja appealed the board's decision. . . . The matter was fully briefed and argued in the Superior Court. On January 4, 2013, [the court, *Berger, J.*] issued a memorandum of decision denying the appeal . . . . Ahuja filed a petition for certification from that decision, which was denied by the Appellate Court on July 24, 2013 . . . .

"On September 17, 2014, [the plaintiff] filed [a third] zoning application, which requested modification of certain conditions imposed by the board in its approval of the second application. More particularly, [the plaintiff] sought to increase the number of residential units from seventeen to nineteen units; increase the amount of available parking by three additional spaces; open an entrance exit on Bradley Place without the obligation to install a traffic signal; and change the form of residential ownership from condominiums to apartments. After public hearings, the board approved the third application on November 17, 2014. Ahuja appealed the board's decision to the Superior Court on . . . December 2, 2014. [The plaintiff] moved to dismiss the appeal on the ground that it was not returned to court within the time required by General Statutes § 52-46a. The motion to dismiss was granted on July 6, 2015. No appeal was taken. . . .

"[The plaintiff] also alleges that [the] defendants engaged in wrongful conduct outside of the immediate context of the [aforementioned] legal proceedings . . . . These allegations relate to false or otherwise tortious communications that [the plaintiff] claims were made by [the] defendants to various nongovernmental individuals or entities with some role in the overall fate of the project. . . . According to [the plaintiff], [the] defendants (1) spread false information about the development plans to neighbors, in an effort to mobilize opposition to the project . . . (2) [contacted] [the plaintiff's] 'lending institutions with the goal of controlling the debt that secured [the plaintiff's] property' . . . and (3) contact[ed] or interfere[d] with [the plaintiff's] current or prospective tenant relationships. . . .

"[The underlying] lawsuit was commenced by [the plaintiff] in 2016. The operative complaint contains seven counts, all of which relate in some way to [the] defendants' alleged campaign to impede [the plaintiff's] project by wrongful means. . . . Four counts of the complaint are brought solely against Ahuja personally— the first count, for common-law vexatious litigation; the second count, for vexatious litigation under General Statutes § 52-568, the third count, for abuse of process, and the fourth count, which alleges that the conduct underlying the first three counts violates [CUTPA]. Two other counts are directed solely at . . . Holdings (the fifth count, for aiding and abetting Ahuja's wrongful conduct as alleged in the first four counts; and the sixth count, for a violation of CUTPA). The seventh count alleges tortious interference with contractual and business relations against both defendants.

"[The defendants] . . . moved for summary judgment on all counts. The sole basis for their motion [was] the *Noerr-Pennington* doctrine, which, as explained [subsequently], confers immunity from civil liability for 'petitioning activity' protected by the first amendment. Broadly speaking, *Noerr-Pennington* immunizes activity undertaken by persons who use the official channels of governmental agencies and courts to advocate their cause, even if that cause consists of nothing more than seeking an outcome adverse to a business competitor and/or favorable to the petitioner's own economic interests. [The plaintiff] . . . filed an objection to the motion for summary judgment, and each party . . . submitted extensive written memoranda and supporting materials. Oral argument [on the motion for summary judgment] was heard [before the trial court] on November 27, 2017. In mid-March, 2018, at [the] plaintiff's initiative and over [the] defendants' objection, the court allowed the parties to submit supplemental briefs. Argument on the supplemental submission was heard [before the trial court] on March 29, 2018." (Footnotes omitted.)

In its May 3, 2018 memorandum of decision, the court granted the motion for summary judgment in favor of the defendants on counts one through six, and denied the motion with respect to the seventh count.[3] Applying the *Noerr-Pennington* doctrine, the court concluded that Ahuja's zoning appeals were immunized from suit and, further, that Ahuja's petitioning activity did not qualify for the sham exception to the doctrine because the relevant zoning appeals were not objectively baseless. The plaintiff has appealed to this court from the judgment rendered on counts one through six. Additional procedural history will be set forth as necessary.

I

The plaintiff first claims that the court erred in concluding, as a matter of law, that Ahuja's zoning appeals

with regard to the plaintiff's proposed development plan were not objectively baseless and, therefore, the sham exception to the *Noerr-Pennington* doctrine was not applicable. We disagree.

"The standard of review of a trial court's decision granting summary judgment is well established. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The courts are in entire agreement that the moving party . . . has the burden of showing the absence of any genuine issue as to all the material facts . . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the [nonmoving] party must present evidence that demonstrates the existence of some disputed factual issue. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Citations omitted; internal quotation marks omitted.) *Lucenti* v. *Laviero*, 327 Conn. 764, 772–73, 176 A.3d 1 (2018).

We begin our analysis by setting forth the background of the *Noerr-Pennington* doctrine generally and, specifically, how it has been applied in Connecticut jurisprudence. In *Zeller* v. *Consolini*, 59 Conn. App. 545, 758 A.2d 376 (2000), this court adopted "the reasoning of a trio of federal antitrust cases, *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U.S. 508, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972) [(*California Motor*)], *United Mine Workers* v. *Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and their progeny, collectively referred to as the *Noerr-Pennington* doctrine.

"In short, the *Noerr-Pennington* doctrine shields from the Sherman [Antitrust] Act [15 U.S.C. § 1 et seq.] a concerted effort to influence public officials regardless of intent or purpose. . . . The United States Supreme Court has reasoned that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and proce-

dures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-à-vis their competitors. *California Motor Transport Co.* v. *Trucking Unlimited*, supra, [404 U.S. 510–11].

"The *Noerr-Pennington* doctrine has evolved from its antitrust origins to apply to a myriad of situations in which it shields individuals from liability for petitioning a governmental entity for redress. [A]lthough the *Noerr-Pennington* defense is most often asserted against antitrust claims, it is equally applicable to many types of claims which [seek] to assign liability on the basis of the defendant's exercise of its first amendment rights. . . . For example, *Noerr-Pennington* has been recognized as a defense to actions brought under the National Labor Relations Act, 29 U.S.C. § 151 et seq.; *Bill Johnson's Restaurants, Inc.* v. *National Labor Relations Board*, 461 U.S. 731, 741, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983); state law claims of tortious interference with business relations; *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 913–15, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982); federal securities laws; *Havoco of America Ltd.* v. *Hollobow*, 702 F.2d 643, 650 (7th Cir. 1983); and wrongful discharge claims. . . .

"Although the *Noerr-Pennington* doctrine provides broad coverage to petitioning individuals or groups, its protection is not limitless. . . . [P]etitioning activity is not protected if such activity is a mere sham or pretense to interfere with no reasonable expectation of obtaining a favorable ruling." (Citations omitted; internal quotation marks omitted.) *Zeller* v. *Consolini*, supra, 59 Conn. App. 550–52.

Preliminarily, it is undisputed that the *Noerr-Pennington* doctrine applies to the present case. The plaintiff argues on appeal, however, that the zoning litigation initiated by Ahuja and supported by Holdings was baseless and thus meets the doctrine's sham exception. In *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993), the United States Supreme Court outlined a two part definition of "sham" litigation. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor . . . ." (Emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 60–61.

"The existence of probable cause to institute legal proceedings precludes a finding that [a] . . . defendant has engaged in sham litigation. The notion of probable cause, as understood and applied in the common-law tort of wrongful civil proceedings, requires the plaintiff to prove that the defendant lacked probable cause to institute an unsuccessful civil lawsuit and that the defendant pressed the action for an improper, malicious purpose. . . . Probable cause to institute civil proceedings requires no more than a reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication. . . . Because the absence of probable cause is an essential element of the tort, the existence of probable cause is an absolute defense. . . . Just as evidence of anticompetitive intent cannot affect the objective prong of *Noerr*'s sham exception, a showing of malice alone will neither entitle the wrongful civil proceedings plaintiff to prevail nor permit the [fact finder] to infer the absence of probable cause. . . . When a court has found that [a] . . . defendant claiming *Noerr* immunity had probable cause to sue, that finding compels the conclusion that a reasonable litigant in the defendant's position could realistically expect success on the merits of the challenged lawsuit. . . . [T]herefore, a proper probable cause determination irrefutably demonstrates that [a] . . . plaintiff has not proved the objective prong of the sham exception and that the defendant is accordingly entitled to *Noerr* immunity." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 62–63.

"Application of the *Noerr-Pennington* doctrine to . . . petitioning activity directed at local governments . . . already is well established. E.g., *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379–84, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991) (city council); *Juster Associates* v. *Rutland*, 901 F.2d 266, 270–72 (2d Cir. 1990) (city); *Racetrac Petroleum, Inc.* v. *Prince George's County*, 786 F.2d 202, 203 (4th Cir. 1986) (county zoning board); *Bob Layne Contractor, Inc.* v. *Bartel*, 504 F.2d 1293, 1296 (7th Cir. 1974) (city zoning board and council). Indeed, many of our own trial courts have applied the *Noerr-Pennington* doctrine in their decisions. E.g., *Roncari Development Co.* v. *GMG Enterprises, Inc.*, 45 Conn. Supp. 408, 414, 718 A.2d 1025 (1997), citing *Connecticut National Bank* v. *Mase*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 269180 (January 31, 1991); *Abrams* v. *Knowles*, Superior Court, judicial district of New London at Norwich, Docket No. 95287 (December 4, 1990) (3 Conn. L. Rptr. 9); *Yale University School of Medicine* v. *Wurtzel*, Superior Court, judicial district of New Haven, Docket No. 275314 (November 9, 1990) (2 Conn. L. Rptr. 813)." *Zeller* v. *Consolini*, supra, 59 Conn. App. 552–53.

In granting the defendants' motion for summary judg-

ment, the court applied the *Noerr-Pennington* doctrine to the defendants' petitioning activity and determined that the activity was immunized from suit. Further, the court determined that the sham exception to the doctrine was inapplicable because Ahuja's zoning appeals were not objectively baseless.[4] Whether the court properly granted summary judgment as to counts one through six essentially comes down to whether the court properly applied the *Noerr-Pennington* doctrine. Accordingly, we will examine the appeals brought by Ahuja with respect to the plaintiff's second and third zoning applications, which were the subject of the causes of action in counts one through six of the plaintiff's complaint.

A

Ahuja's Appeal of the Second Application

Having set forth the *Noerr-Pennington* doctrine and its applicability to Ahuja's petitioning activity in the present case, we now turn to the plaintiff's claims with regard to Ahuja's appeal of the second application. First, the plaintiff claims that the court erred in concluding as a matter of law that Ahuja's appeal of the board's approval of the second application was objectively baseless. Specifically, the plaintiff claims that Ahuja's appeal was objectively baseless in that she alleged that the board acted "illegally, unlawfully, [and] arbitrarily" in granting the plaintiff's second application because the notice for several of the public hearings was inadequate and that the application was materially changed after one of the public hearings.

The following additional procedural history is relevant to this portion of the plaintiff's appeal. In July, 2011, while the plaintiff's appeal from the denial of its first application was pending, the plaintiff filed a second application for a special permit and architectural/site plan approval. In preparation for a public hearing for the second application held on September 26, 2011, the board published notice in the Stamford Advocate on September 14 and 21, 2011. The public hearing was continued to October 6, 2011, and then to October 24, 2011, due to the large number of citizens who wished to speak on the application. The board did not publish additional notice for the continued hearings. The board also published notice in the Stamford Advocate on October 28 and November 4, 2011, for a public hearing on November 10, 2011. Following the board's approval of the plaintiff's second application, Ahuja appealed the board's decision, alleging that the board acted "illegally, unlawfully, [and] arbitrarily." Specifically, Ahuja alleged that "(a) [t]he board lacked jurisdiction to hear and decide the [second] application where notice of the public hearings held on October 6, 2011, and October 24, 2011, was not published in a newspaper having general circulation in the city of Stamford; [and] (b) the board lacked jurisdiction to approve the application since it

was materially changed by [the plaintiff] at the last public hearing held on November 10, 2011. The changes made to the application on November 10, 2011, were material and therefore constituted a new application. The board lacked jurisdiction to approve the new application since it did not comport with the notice requirements of General Statutes § 8-3 et seq. and the Stamford Zoning Regs., art. VI, § 20." The court rejected Ahuja's claims and denied the appeal.

1

No Notice Claim

First, we address the portion of the plaintiff's claim relating to Ahuja's appeal of the second application on the basis that adequate notice was not provided for several of the public hearings associated with the second application.

The court, in granting the motion for summary judgment in favor of the defendants, found "that Ahuja's legal claims regarding notice were supported by probable cause." Ahuja's appeal of the second zoning application was based in part on the assertion that with respect to several of the public hearings associated with the second application, notice was not provided in compliance with the relevant provision of the Stamford Charter (charter). Specifically, Ahuja argued that notice was not provided for the public hearings on October 6 and 24, 2011. The public hearings in question were continued from an initial public hearing held on September 26, 2011, for which adequate notice was provided. In determining that Ahuja's appeal with regard to the notice claim was not objectively baseless, the court most heavily relied on the plain text of the relevant charter provisions which "provided Ahuja with a solid foundation to contend that a new notice was required for every public hearing, 'continuation' or otherwise." In particular, the court looked to the language of §§ C6-40-11 and C6-40-12 of the charter. Section C6-40-11, titled "Notice of Public Hearings," provides in relevant part: "Notice of each public hearing held with respect to amendments of the Zoning Regulations and Map or applications for approval of site and architectural plans and/or requested uses shall be given by publishing in an official newspaper the time, place and purpose of such hearing. . . . Said notice shall be published at least twice, the first not more than fifteen nor less than ten days before such hearing, and the last not less than two days before such hearing . . . ." Section C6-40-12, titled "Hearings," provides that "[i]f more than one public hearing is considered by the Zoning Board to be necessary or advisable, additional hearings may be held upon due notice, as herein above set forth, provided no more than ninety days shall elapse between the first and last hearing on any one petition, unless the petitioner agrees in writing to an extension of such period." The court determined that "Ahuja's argu-

ment—that the literal text of § C6-40-12 requires notice of any and all 'additional hearing[s]' held in connection with an application—posits a very plausible construction of the charter provision. The text of § C6-40-12 does not limit its application to 'new' or 'separate' hearings, or otherwise create a category of 'continuation' hearings exempt from the notice requirement. The provision's literal terms would seem to include *any* 'additional' hearing, and its context would appear to contemplate precisely the situation confronted in connection with the second application, when the first public hearing was insufficient to complete the board's full consideration of the zoning matter at issue." (Emphasis in original.)

In challenging the court's determination that Ahuja's second zoning appeal, which was based in part on a claim that notice was deficient, was not objectively baseless, the plaintiff points both to the plain text of the charter, and to Connecticut case law. First, in looking to the language of the relevant charter provisions, the plaintiff asserts that the drafters contemplated that the continuation of public hearings would be a common phenomenon, and that if they intended for notice to be provided for each continuation, they would have included language to that effect. The omission of such language, according to the plaintiff, is indicative of the drafters' intentions not to require notice for continuations, and that Ahuja, in looking at the plain language of the charter, should have considered that her appeal would not likely succeed.

Second, in support of its argument, the plaintiff relies primarily on two cases; *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, 281 Conn. 66, 912 A.2d 1008 (2007) (*Roncari Industries*), and *Carberry* v. *Zoning Board of Appeals*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-00-0176766 (October 16, 2001) (30 Conn. L. Rptr. 537). In *Roncari Industries*, a neighbor who owned property that abutted the property at issue, appealed the decision of the town planning and zoning commission, which granted the landowner's application for a special permit. The basis of the plaintiff's appeal was that "the commission failed to satisfy the notice requirements of General Statutes (Rev. to 2001) § 8-3 regarding the public hearing because the notice given for the originally scheduled public hearing was insufficient to apprise the public that the matter was scheduled to be heard on a later date . . . ." (Footnote omitted.) *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, supra, 70–71. The court held that "[§] 8-3 does not require the publication of additional notices when the public hearing is continued or rescheduled; the statute is silent with regard to notice when the hearing is postponed. Similarly, nothing in the town's zoning regulations requires the publication of additional notices when a public hearing is rescheduled or continued."

Id., 73.

Similarly, in *Carberry*, the plaintiff claimed that the notice given of a continued hearing was defective because there was no newspaper publication of the fact that the relevant application would be considered on that date. *Carberry* v. *Zoning Board of Appeals*, supra, 30 Conn. L. Rptr. 537. The relevant notice provision in *Carberry* was that set forth in General Statutes § 8-7d.[5] Id., 541. The court found that the notice for the continued hearing did not need to comply with the requirements in § 8-7d (a). Id. Specifically, the court stated that "[r]equiring new newspaper publication of notice for a hearing that is continued beyond the original date would place an undue burden on local boards and commissions which as a general practice meet during the evening hours of the work week. There are many conceivable and appropriate reasons for a zoning board of appeals not to complete a hearing on a matter in a single weekday evening. If each continuation of a hearing imposed the necessity of a new newspaper publication schedule, it would severely constrain the scheduling of new dates and slow down the process." Id.

The plaintiff purports in its brief that "[t]here are no material differences" between the present case and *Roncari Industries* and, therefore, that "[t]here is no way a reasonable litigant reading *Roncari Industries* and assessing whether the defendants' 'no notice' argument had a reasonable chance of succeeding could rationally conclude that the argument had any such prospect." The plaintiff further contends that the notice provisions in *Roncari Industries* and the present case are "virtually identical." The plaintiff also asserts that the defendants' reading of *Carberry* "could only have enforced the view that the argument was hopeless." Although we agree with the plaintiff that the aforementioned case law did not necessarily support Ahuja's appeal, that fact does not automatically make Ahuja's appeal objectively baseless. The cases relied on by the plaintiff, even if brought to Ahuja's attention, would not make her appeal of the second application objectively baseless because in those cases the courts analyzed notice provisions that were entirely different from the provision in the present case. Specifically, the court in *Roncari Industries* conducted a notice analysis entirely under the purview of General Statutes (Rev. to 2001) § 8-3 (a)[6] and the court in *Carberry* focused its analysis on § 8-7d (a), whereas in the present case the relevant notice provisions are §§ C6-40-11 and C6-40-12 of the charter.[7]

In its memorandum of decision granting summary judgment in favor of the defendants, the court noted that "the text of the relevant charter provisions provided Ahuja with a solid foundation to contend that a new notice was required for *every* public hearing, 'continuation' or otherwise. Section C6-40-11 of the

charter contains the basic requirement that the board give notice of a public hearing to be held on certain types of zoning applications. Section C6-40-12 of the charter provides specifically for the situation where a matter before the board requires more than one hearing: "If more than one public hearing is considered by the Zoning Board to be necessary or advisable, *additional hearings may be held upon due notice, as herein above set forth* . . . . Ahuja's argument—that the literal text of § C6-40-12 requires notice of any and all 'additional hearing[s]' held in connection with an application—posits a very plausible construction of the charter provision. The text of § C6-40-12 does not limit its application to 'new' or 'separate' hearings, or otherwise create a category of 'continuation' hearings exempt from the notice requirement. The provision's literal terms would seem to include *any* 'additional' hearing, and its context would appear to contemplate precisely the situation confronted in connection with the second application, when the first public hearing was insufficient to complete the board's full consideration of the zoning matter at issue." (Emphasis in original.)

We conclude that the court's determination, which was grounded in the language of the relevant charter provisions, is legally and logically correct. We agree that a reasonable litigant, reading the notice provisions of §§ C6-40-11 and C6-40-12, could deduce that notice is required for every public hearing, including a continuation. In particular, the charter's use of the word "additional," without specific omission of continuations, could lead a reasonable litigant to believe that any additional hearing, including a continuation, requires notice pursuant to the relevant charter provisions. We disagree with the plaintiff's contention that the notice provisions at issue in *Roncari Industries*[8] and the charter are virtually identical. *Roncari Industries* concerned a provision of the General Statutes, and the present case concerns a notice provision from the charter. Further, General Statutes (Rev. to 2001) § 8-3 (a) in *Roncari Industries* does not include the word "additional," which is included in the notice provision of the charter. The similarity between *Roncari Industries* and the present case begins and ends with the fact that both notice provisions are silent with regard to the term "continuation." We conclude, however, that the differences between the two provisions are such that a reasonable litigant relying on the notice provisions in the charter could bring an appeal on the ground of lack of notice for a continued hearing, despite the outcome in *Roncari Industries*.

Further, we conclude that the trial court's determination regarding the notice aspect of the second application is consistent with this court's prior analysis of the *Noerr-Pennington* doctrine. Specifically, in *Zeller* v. *Consolini*, supra, 59 Conn. App. 553–54, this court stated that "failure to apply the *Noerr-Pennington* doc-

trine aggressively may create a chilling effect on the first amendment right to petition in zoning and other matters. . . . Indeed, such a chilling effect can be a virtual deep freeze when individual citizens not versed in the legal system and without financial resources do not exercise potentially meritorious legal challenges for fear of costly and protracted, retributive litigation from opponents." (Citations omitted; internal quotation marks omitted.) We decline to accept the plaintiff's reasoning that, on the basis of the holdings in *Roncari Industries* and *Carberry*, Ahuja should have known that her notice argument was meritless and, therefore, objectively baseless. As aforementioned, *Roncari Industries* and *Carberry* did not analyze the specific notice provisions at issue in the present case. The type and language of the notice provisions in the cases relied on by the plaintiff and that are at issue in the present case were not identical. To hold Ahuja, and future parties, to the standard suggested by the plaintiff would contradict our holding in *Zeller*. Although we agree with the court that Ahuja's appeal of the second application on the notice issue ultimately was not successful, that is not determinative of whether the appeal was objectively baseless. To the contrary, we agree with the court that a reasonable litigant could have expected to prevail on the basis of Ahuja's notice argument.

Finally, the court concluded that, despite the fact that Ahuja's argument was not successful before the board, "and perhaps it should have lost . . . it was by no means groundless." We conclude that the court's finding in this respect is legally and logically correct. Specifically, the trial court's rationale closely adheres to the reasoning in *Zeller* v. *Consolini*, supra, 59 Conn. App. 545. In particular, in *Zeller*, this court stated: "The defendants' opposition to the plaintiffs' zoning requests and the defendants' subsequent appeals were legally available to the defendants and followed applicable judicial procedure. Merely because those attempts failed does not in itself make them baseless acts. A failure of the challenged action is only one factor in determining whether an action is a sham. . . . [W]hen the . . . defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." (Citation omitted; internal quotation marks omitted.) Id., 560. Similarly, here, we conclude that the outcome of the defendants' appeal of the second application is not determinative of whether that appeal was objectively baseless under the *Noerr-Pennington* doctrine.

We conclude that, with regard to Ahuja's appeal of the second application, the court properly determined that Ahuja's actions were not objectively baseless and were not a sham that would strip away the protection of the *Noerr-Pennington* doctrine and properly found

no genuine issue of material fact.

2

Mid-hearing Changes Claim

The second ground raised in Ahuja's appeal of the approval of the plaintiff's second application was that the board lacked jurisdiction to approve the application because it was materially changed by the plaintiff at the last public hearing held on November 10, 2011.

With regard to the mid-hearing changes claim, the plaintiff purports that "the trial court never addressed [Ahuja's] mid-hearing change claim and thus, expressed no view on whether it was objectively baseless or not." The defendants, in their brief, agree that the court did not address the mid-hearing change claim, but stated that the trial court was not required to address that portion of the claim because it had already made a determination that the notice portion of the appeal of the second application was not objectively baseless.

We agree with the defendants for two reasons. First, we look to the language of *Professional Real Estate Investors, Inc.*, the seminal case concerning the sham exception to the *Noerr-Pennington* doctrine. Specifically, the court stated that in order to be a sham, a "*lawsuit* must be objectively baseless . . . ." (Emphasis added.) *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, supra, 508 U.S. 60. Further, the court stated that "[i]f an objective litigant could conclude that the *suit* is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and . . . [a claim] premised on the sham exception must fail." (Emphasis added.) Id. The court's use of the broad terms "lawsuit" and "suit" reflects that it is unnecessary for each claim within an action to survive scrutiny under the sham exception to the *Noerr-Pennington* doctrine provided that the action contains at least one claim that is not a sham.

Second, multiple federal courts have held that an action cannot be classified as a sham so long as at least one claim in the action has objective merit. For instance, in *Trustees of University of Pennsylvania* v. *St. Jude Children's Research Hospital*, 940 F. Supp. 2d 233, 247 (E.D. Pa. 2013), the court stated that "[c]ourts have routinely held that as long as some of the claims in a complaint have a proper basis, the lawsuit is not a sham for *Noerr-Pennington* purposes." (Internal quotation marks omitted). Further, in *Dentsply International, Inc.* v. *New Technology Co.*, United States District Court, Docket No. 96-272 (MMS) (D. Del. December 19, 1996), the court held that "litigation will not be considered a sham so long as at least one claim in the lawsuit has objective merit." (Internal quotation marks omitted). Similar language was used by the court in *Eden Hannon & Co.* v. *Sumitomo Trust & Banking Co.*, 914 F.2d 556, 565 (4th Cir. 1990), in which the court

held that an action containing one claim with objective merit was "hardly a sham." Finally, in *In re Flonase Antitrust Litigation*, 795 F. Supp. 2d 300, 311–12 (E.D. Pa. 2011), stated that "[p]laintiffs do not need to show a realistic expectation of success on *all* of [the] arguments in each petition and its lawsuit." (Emphasis in original.)

Connecticut courts have yet to address whether, in the context of the *Noerr-Pennington* doctrine, a court may conclude that a party's action was not objectively baseless on the basis of one claim in the action having merit. We agree with the federal courts that have concluded that a party's action cannot be objectively baseless when at least one claim in the action has merit. We are in accordance with the court's reasoning in *Trustees of University of Pennsylvania* v. *St. Jude Children's Research Hospital*, supra, 940 F. Supp. 2d 247, that such a holding is consistent with the "very narrow scope" of the *Noerr-Pennington* doctrine's sham exception.

As discussed in part I of this opinion, we conclude that, on the basis of the defendants' notice claim, Ahuja's appeal of the second application was not objectively baseless. For this reason, the court properly rendered summary judgment in favor of the defendants with respect to the plaintiff's claim that Ahuja's appeal of the second zoning application met the sham exception to the *Noerr-Pennington* doctrine. Accordingly, we need not reach the second ground on which Ahuja premised her appeal of the second application—that the board lacked jurisdiction to approve the application because the application had been materially changed.

B

Ahuja's Appeal of the Third Application

The plaintiff also claims that the court erred in granting summary judgment in favor of the defendants because Ahuja's appeal of the plaintiff's third zoning application was objectively baseless.

The following procedural history, as set forth by the court in its memorandum of decision, is relevant to this portion of the appeal. "The third application was submitted by [the plaintiff] to modify certain conditions that the board had placed on the development project in its previous decisions. These modifications, among other things, sought to increase the number of units approved to nineteen units; increase the amount of available parking by three additional spaces; open an entrance exit on Bradley Place without the obligation to install a traffic signal; and change the form of ownership from condominiums to apartments. . . . [T]here was some amount of neighborhood opposition to the third application. The thrust of this opposition was that the conditions attached by the board to its prior approval of the project in December, 2011 (as part of the second

application) was based on a compromise reached by [the plaintiff] with opponents of the project; the neighbors claimed that [the plaintiff's] third application reneged on important components of that prior agreement by seeking modifications that would, among other things, increase the number of residential units from seventeen to nineteen and change the residential ownership from condominium to rental units. . . .

"In a four to one split decision, the board voted to approve the third application on November 17, 2014, effective November 21, 2014. It appears . . . that the majority failed to provide any reasons for its approval. . . . [D]uring the board's brief deliberations, Stamford's associate planner read aloud to the board from the text of condition [No.] 2 to the board's prior approval of the special exception. . . . Condition [No.] 2 stated that the project's 'residential development shall be limited to a total of seventeen units to be in condominium form of ownership.' The meeting minutes reflected that the board members were polled, and the majority indicated that they were 'okay with adding the two additional units.' The board did not explain why the modification was 'okay.'

"Ahuja appealed the board's decision to the Superior Court by complaint dated December 2, 2014, with a return date January 6, 2015. The appeal claimed, among other things, that there was not 'substantial evidence' in the record to support the board's approval of the special exception under § 19-3.2 of the Stamford Zoning Regulations." Specifically, in her appeal, Ahuja claimed that "[i]n approving the [third] application, the board acted illegally, unlawfully, arbitrarily, upon unlawful procedures, in excess of its authority, and in abuse of its discretion, in one or more of the following respects: (a) The board lacked jurisdiction to hear and decide the [third] application where notice of the public hearing held on November 10, 2014 was not provided to abutters within the meaning of [General Statutes] § 8-8 (a) (1), [and] (b) the board lacked jurisdiction to approve the [third] application, as there was no traffic impact study submitted with the [third] application that is a prerequisite for the . . . board to act upon an application pursuant to the Stamford zoning regulations." "[The plaintiff] moved to dismiss the appeal on the ground that it was not returned to court within the time required by General Statutes § 52-46a. The motion to dismiss was granted on July 6, 2015. No appeal was taken from that disposition."

Preliminarily, the court noted that, because the appeal was dismissed on procedural grounds, it did not have insight into how a reviewing court would have ruled on Ahuja's appeal of the third application. Regardless, the court stated that its "review of the underlying record leads to the firm conviction that a court considering the merits reasonably might have concluded that

substantial evidence did not support the board's decision to grant the special exception sought in the third application. It is unlikely, but a reversal might have been obtained based on a court's view of the evidence in light of the five relevant categories to be taken into account under § 19-3.2 of the Stamford zoning regulations. More likely is the possibility that a Superior Court would have been particularly concerned that the board originally saw fit, in December, 2011, to place express conditions on its approval of the special exception by allowing a maximum of seventeen residential units but, then, in 2014, changed that limitation to permit the developer to increase the number of units to nineteen without justifying the modification, and without explaining what circumstances leading to the original limitation had changed."

As the court alluded to in its discussion of the third application, a court reviewing the decision of a zoning board does so under the "substantial evidence" analysis. "The evidence supporting the decision of a zoning board must be substantial. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration. . . . The corollary to this rule is that absent substantial evidence in the record, a court may not affirm the decision of the board." (Citations omitted; internal quotation marks omitted.) *Martland* v. *Zoning Commission*, 114 Conn. App. 655, 663, 971 A.2d 53 (2009).

In its brief, the plaintiff argues that its third application did not seek a special exception and, therefore, the trial court's determination is "based on a flawed analysis." Rather, the plaintiff states that, prior to the third application, it had received two special exceptions; one via the decision on the first application and a second via the decision on the second application. The plaintiff claims that, as a result of these two special exceptions, it had already satisfied the zoning regulations special exception requirements and it was therefore entitled to approval in each instance.

The defendants argue that the court was correct in its determination that Ahuja's appeal of the third appli-

cation was not objectively baseless because "[a]ny reasonable litigant in [Ahuja's] position would conclude the modifications sought were conditions that contradicted what was previously agreed upon in prior applications and approvals." As aforementioned, the third application specifically attempted to increase the number of residential units in the second floor of one of the buildings, to increase the number of available parking spots by three spaces, to change the residential use of the units from condominiums to apartments, and to open an entrance exit on Bradley Place without the obligation of a traffic signal. In support of its argument, the defendants also point to the fact that seventeen members of the public voiced their opposition to the third application at a public hearing. Finally, the defendants argue that the appeal of the third application was not objectively baseless because "the plaintiff failed to provide a traffic impact study in support of the third application, despite the study being requested by the city traffic engineer. . . . Stamford Zoning Regulations § 7.2C requires the applicant to submit a traffic impact study when requested by the city traffic engineer." Therefore, the defendants purport that "[a]ny reasonable litigant in [Ahuja's] position would conclude the plaintiff's failure to submit a required traffic study made the third application defective and incomplete."

The plaintiff correctly asserts that the court did not address each of the modifications individually in determining that Ahuja had probable cause to appeal the third application. Under our plenary review, we turn first to the defendants' argument that the appeal was not objectively baseless because the plaintiff did not provide a traffic impact study, as required by Stamford zoning regulations. Preliminarily, the Connecticut Practice Series states that "[f]or a special permit to be granted, it must appear from the record before the agency that the application met all conditions imposed by the regulations." R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 33.4, p. 278. Alternatively, "[a] special permit can only be denied for failure to meet specific standards in the regulation . . . ." Id. The relevant regulation in this case was § 7.2C15 of the Stamford Zoning Regulations, which provides in relevant part that "[a] traffic impact and access study shall be submitted, prepared by a State of Connecticut Registered Professional Engineer qualified to prepare such studies, where . . . considered necessary in the judgment of the City Traffic Engineer." Here, before the trial court on the motion for summary judgment as Exhibit CC was a letter from a city traffic engineer, requesting a traffic impact study from the plaintiff for the intersection where a traffic light was proposed to be installed. The plaintiff counters that the third application was not incomplete by means of the missing traffic impact study because one of the relevant roads in the intersection was a state road and,

therefore, only the Department of Transportation (department) had the power to authorize the installation of traffic lights.

On the basis of the parties' arguments, we conclude that the court correctly determined that Ahuja's appeal of the third application was not objectively baseless. The plaintiff's failure to submit a traffic impact study resulted in its noncompliance with the Stamford zoning regulations. We agree with the defendants' argument that a reasonable litigant in Ahuja's position would conclude that the plaintiff's noncompliance resulted in an incomplete application and, thus, provided a proper basis for an appeal to the board. See *Two Yale & Towne, LLC* v. *Zoning Board of Appeals*, Superior Court, judicial district of Hartford, Docket No. CV-13-6046438-S (July 24, 2014) (court dismissed appeal on basis of incomplete application that was noncompliant with zoning regulations); *Cohen* v. *Zoning Board of Appeals*, Superior Court, judicial district of Fairfield, Docket No. CV-12-6026111-S (October 31, 2012) (court sustained appeal on basis of incomplete application that was non-compliant with town zoning regulations).

The plaintiff counters by referring to its submissions in its objection to the motion for summary judgment, arguing that shortly before the board's approval of the third application, the plaintiff testified at a public hearing regarding the traffic light. Specifically, the plaintiff testified before the board that one of the roads in question was a state road and, therefore, that only the department had the power to authorize the installation of a traffic light. The plaintiff also testified that it sought the department's authorization for a traffic light, but that the department rejected the request on the basis of a study of traffic counts in the area. During this testimony, a chairman of the board asked the plaintiff whether it had documentation confirming the department's denial of the request. The plaintiff did not definitively provide an answer as to whether documentation existed, but the record does not contain any written notice confirming the fact to which the plaintiff testified. Further, the record does not suggest that the city traffic engineer rescinded the requirement that the plaintiff provide a traffic impact study. Therefore, our review of the record leads to the conclusion that, on the basis of the plaintiff's failure to submit a traffic impact study, a reasonable litigant could have determined that the plaintiff's third application was noncompliant with the Stamford zoning regulations and, therefore, there was not substantial evidence supporting the approval of the application. Accordingly, we conclude that the trial court properly granted summary judgment in favor of the defendants because the appeal of the third application was not objectively baseless.

Finally, we conclude that we need not reach the issue of whether Ahuja's appeal was objectively baseless on

the basis of the ground alleged therein related to modifications of the application, in addition to the omission of the traffic impact study. In coming to this conclusion, we refer to the aforementioned principle in part I A 2 of this opinion that an action cannot be a sham under the *Noerr-Pennington* doctrine so long as at least one claim within the action has merit. See *Eden Hannon & Co.* v. *Sumitomo Trust & Banking Co.*, supra, 914 F.2d 556; *Trustees of University of Pennsylvania* v. *St. Jude Children's Research Hospital*, supra, 940 F. Supp. 2d 233;; *In re Flonase Antitrust Litigation*, supra, 795 F. Supp. 2d 311–12; *Dentsply International, Inc.* v. *New Technology Co.*, supra, United States District Court, Docket No. 96-272 (MMS). Because we conclude that a reasonable litigant could appeal the approval of the third application solely on the basis of the missing traffic impact study, we conclude that Ahuja's appeal of the approval of the third application was not objectively baseless. Therefore, the defendants met their burden to show that no genuine issue of material fact existed.

## II

The plaintiff next claims that the court misinterpreted the sham exception under the *Noerr-Pennington* doctrine. Specifically, the plaintiff asserts that "objectively baseless" is not the proper standard for sham exception applicability. The plaintiff argues that because the challenged petitioning activity consists of several legal proceedings rather than a single proceeding, and that the defendants also engaged in significant, allegedly ill motivated and false communications to nongovernmental individuals and entities, the court also should have taken into account the defendants' subjective motivations and intentions. We disagree.

The plaintiff proposes that this court should develop a new sham exception analysis under the *Noerr-Pennington* doctrine that takes into account both the objective reasonableness of petitioning activity as well as the subjective intent of the party engaging in the petitioning activity. The plaintiff did not ask the trial court to fashion a new sham exception analysis or to apply such an analysis to the facts at hand. Rather, the plaintiff unequivocally asserted to the trial court in its "Response to Defendants' Motion for Summary Judgment" that "the correct test to apply to this matter is the pattern test from *California Motor Transport* [*Co.*] v. *Trucking Unlimited*, [supra, 404 U.S. 508]."[9]

Regardless of the plaintiff's request to this court to fashion a new sham exception analysis, we conclude that the trial court applied the correct analysis from *Professional Real Estate Investors, Inc.* As aforementioned, in *Professional Real Estate Investors, Inc.*, the United States Supreme Court outlined a two part analysis under which to analyze whether petitioning activity under the *Noerr-Pennington* doctrine should be classified as a sham and, therefore, unprotected. In setting

forth the sham exception analysis, the court emphasized that "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, supra, 508 U.S. 60. About twenty years before the court's holding in *Professional Real Estate Investors, Inc.*, the court had analyzed the sham exception in *California Motor Transport Co.* v. *Trucking Unlimited*, supra, 404 U.S. 508. In *California Motor*, the court explained that sham litigation occurs where "a pattern of baseless, repetitive claims . . . emerge[s] which leads the factfinder to conclude that the administrative and judicial processes have been abused." Id., 513.

Following *California Motor*, a line of circuit court cases held that, although the *Professional Real Estate Investors, Inc.* test is well suited for a sham exception analysis involving one underlying proceeding, it is not conducive to an analysis involving a series of legal proceedings and, therefore, the *California Motor* sham exception analysis should apply in scenarios involving the latter. For example, in *Hanover 3201 Realty, LLC* v. *Village Supermarkets, Inc.*, 806 F.3d 162, 180–81 (3d Cir. 2015), the United States Court of Appeals for the Third Circuit held that "when a party alleges a series of legal proceedings, we conclude that the sham exception analysis from *California Motor* should govern. This inquiry asks whether a series of petitions were filed with or without regard to merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade. In deciding whether there was such a policy of filing petitions with or without regard to merit, a court should perform a holistic review that may include looking at the defendant's filing success . . . as circumstantial evidence of the defendant's subjective motivations. . . . Courts should also consider other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity . . . ." (Citations omitted; internal quotation marks omitted.) Similarly, the United States Court of Appeals for the Second Circuit noted that, when applying the sham exception analysis from *California Motor*, the relevant issue is "whether the legal challenges are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." (Internal quotation marks omitted.) *Primetime 24 Joint Venture* v. *National Broadcasting Co.*, 219 F.3d 92, 101 (2d Cir. 2000); see also *Waugh Chapel South, LLC* v. *United Food & Commercial Workers Union Local 27*, 728 F.3d 354 (4th Cir. 2013); *USS-POSCO Industries* v. *Contra Costa County Building & Construction Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994).

Here, the court concluded that the test set forth in *Professional Real Estate Investors, Inc.* was the correct

standard to apply to the sham exception to the *Noerr-Pennington* doctrine. The court stated that the plaintiff's request that the court apply the *California Motor* analysis "is based largely on a line of cases interpreting the United States Supreme Court precedent to limit the scope of *Professional Real Estate Investors, Inc.* to circumstances not present [in the present case]. [The plaintiff] relies on the Supreme Court decision in *California Motor* . . . a case decided more than twenty years before *Professional Real Estate Investors* [*Inc.*], but understood by some federal courts to provide an alternative 'sham' analysis in cases involving 'multiple' acts of petitioning activity—which includes the present case, according to [the plaintiff].[10] [The plaintiff] insists that because the sham exception described analysis in *California Motor* requires inquiry into [the] defendants' subjective motivations and intentions, this case cannot be resolved by summary judgment. . . . The *California Motor* analysis advanced by [the] plaintiff applies a more 'holisitic' inquiry than the two part test applicable under *Professional Real Estate Investors* [*Inc.*] to petitioning activity involving single underlying proceedings." (Footnote added.) The court rejected the plaintiff's argument and instead applied the two part analysis articulated in *Professional Real Estate Investors, Inc.*

On the basis of our plenary review of the record, we conclude that the court applied the correct analysis for the sham exception. The cases relied on by the plaintiff suggest that in order for a court to apply the more holistic *California Motor* analysis, the petitioning activity must consist of a "pattern" or "series" of legal proceedings. Particularly, many of the courts that have applied the *California Motor* analysis rather than the two part test set forth in *Professional Real Estate Investors, Inc.* have done so in cases that have concerned quantities of proceedings that far outnumber those in the present case. See, e.g., *Waugh Chapel South, LLC* v. *United Food & Commercial Workers Union Local 27*, supra, 728 F.3d 354 (court applied *California Motor* sham exception analysis in case involving fourteen underlying proceedings); *USS-POSCO Industries* v. *Contra Costa County Building & Construction Trades Council, AFL-CIO*, supra, 31 F.3d 800 (court relied on *California Motor* analysis when petitioning activity included twenty-nine lawsuits).

Further, in its memorandum of decision, the court aptly pointed to a number of cases in which courts have applied the *Professional Real Estate Investor, Inc.* analysis to cases involving more than one underlying proceeding. In particular, the court referred to *ERBE Elektromedizin GmbH* v. *Canady Technology, LLC*, 629 F.3d 1278, 1291–92 (Fed. Cir. 2010) (court declined to apply holistic analysis to three underlying lawsuits); *Amarel* v. *Connell*, 102 F.3d 1494, 1519–20 (9th Cir. 1997) (court held that two underlying lawsuits did not trigger *California Motor* analysis); *Polaris Industries,*

*Inc.* v. *Arctic Cat, Inc.*, United States District Court, Docket No. 15-4475 (JRT/FLN) (D. Minn. March 29, 2017) (court held that three cases did not amount to series of legal proceedings requiring application of *California Motor* sham analysis); and *In re Flonase Antitrust Litigation*, supra, 795 F. Supp. 2d 300 (court declined to apply *California Motor* test to five underlying petitions). Similarly, in *Zeller* v. *Consolini*, supra, 59 Conn. App. 545, this court applied the two part analysis from *Professional Real Estate Investors, Inc.*, to a case with three underlying proceedings.

The present case involved only three zoning appeals. The plaintiff has not demonstrated, therefore, that the approach set forth in *California Motor* should have been applied. We agree with the trial court that a court has never applied the *California Motor* sham exception analysis in a case involving so few proceedings.[11] We, therefore, agree that the trial court properly applied the two part analysis from *Professional Real Estate Investors, Inc.*, in rendering summary judgment in favor of the defendants.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Gurpreet Ahuja died on December 28, 2016, several months after the commencement of this action, and the executor of her estate has been substituted as a defendant.

[2] See *Zeller* v. *Consolini*, 59 Conn. App. 545, 758 A.2d 376 (2000), for a discussion of this doctrine.

[3] The seventh count, alleging tortious interference with business expectations, was subsequently withdrawn and is not at issue in this appeal. Likewise, the court found that "[t]here are limited allegations incorporated in the first six counts regarding what [the] plaintiff labels 'nonpetitioning activity' . . . but the court is under the impression that those allegations are intended to establish [the] defendants' motive and intentions underlying the petitioning activity. Only the seventh count seeks damages allegedly caused by the nonpetitioning activity." On appeal, the plaintiff does not raise a claim of error with respect to this aspect of the court's decision. The plaintiff's only reference to the nonpetitioning activity as it relates to counts one through six is in a footnote in its brief. Therein, the plaintiff states, in a conclusory fashion, that its counts of abuse of process and violation of CUTPA were pleaded on the basis of the defendants' nonpetitioning activity, and that both counts were "perfectly viable without any requirement that the underlying claim be objectively baseless." The plaintiff does not separately brief these issues within the body of its brief nor offer sufficient authority in support of its proposition. Therefore, we conclude that this portion of the plaintiff's argument is not sufficiently briefed in accordance with our briefing requirements and we consider these claims abandoned. See *Clelford* v. *Bristol*, 150 Conn. App. 229, 233, 90 A.3d 998 (2014) ("It is well settled that [w]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.)).

[4] The trial court determined that Ahuja's appeal of the plaintiff's first application was immunized under the *Noerr-Pennington* doctrine, and was

not objectively baseless and, therefore, not subject to the doctrine's sham exception. In its appellate brief, the plaintiff has not set forth a claim of error with respect to the court's ruling regarding Ahuja's appeal of the first application and, therefore, we decline to review it on appeal.

[5] The portion of § 8-7d that was relevant in *Carberry* provides: "Notice of the hearing shall be published in a newspaper having a general circulation in such municipality where the land that is the subject of the hearing is located at least twice, at intervals of not less than two days, the first not more than fifteen days or less than ten days and the last not less than two days before the date set for the hearing." General Statutes § 8-7d (a). The court did not address the specific language of the statute in coming to its conclusion.

[6] At the time of the public hearing in *Roncari Industries*, § 8-3 (a) required that "[n]otice of the time and place of such [public] hearing shall be published in the form of a legal advertisement appearing in a newspaper having a substantial circulation in such municipality at least twice at intervals of not less than two days, the first not more than fifteen days nor less than ten days and the last not less than two days, before such hearing . . . ." General Statutes (Rev. to 2001) § 8-3 (a).

[7] As noted in Judge Berger's January 4, 2013 memorandum of decision, "[u]nlike most zoning commissions . . . planning and zoning in Stamford [is] governed by 26 Spec. Laws 1228, No. 619, hereinafter referred to as the Stamford Charter (1953), rather than by the General Statutes."

[8] The plaintiff asserts, and we agree, that the court did not refer to *Roncari Industries* in its memorandum of decision. The court did, however, refer to Judge Berger's decision, which contained analyses of both *Roncari Industries* and *Carberry*.

[9] The sham exception analysis set forth by *California Motor Transport Co.* v. *Trucking Unlimited*, supra, 404 U.S. 508, is discussed subsequently in this opinion.

[10] The plaintiff also urges that in holistically assessing the defendants' subjective motivations, we should also consider their allegedly false, nonpetitioning activities directed to nongovernmental agencies to foster opposition to the plaintiff's proposed development. The plaintiff does not offer any authority in support of this argument. As previously noted, the court, in finding that none of the defendants' litigation was baseless, did not need to consider the defendants' subjective motivations, which is the second part of the test set forth in *Professional Real Estate Investors*, *Inc.*

[11] To our knowledge, the *California Motor* sham exception analysis was applied once in the context of an action involving four proceedings. See *Hanover 3201 Realty*, *LLC* v. *Village Supermarkets*, *Inc.*, supra, 806 F.3d 162. The court, however, provided little reasoning for such application. The court noted "we do not set a minimum number requirement for the applicability of *California Motor* or find that four sham petitions will always support the use of *California Motor*." Id., 181. The plaintiff's reliance on this case does not persuade this court to abandon the two part analysis set forth in *Professional Real Estate Investors*, *Inc.*